United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMISE JERMAINE CALLOWAY,

        Plaintiff,

  v.

CONTRA COSTA COUNTY JAIL
CORRECTIONAL OFFICERS, et al.,

        Defendants.
_____/

No. C 01-2689 SBA

**ORDER**

[Docket Nos. 145, 147, 149, 151, 170, 179, 184]

    This matter comes before the Court on Defendants' Motions for Summary Judgment or Judgment on the Pleadings.[1]  Having read and considered the parties' papers, the Court considers this matter appropriate for decision without oral argument.

**BACKGROUND**

    This is a prisoner civil rights case.  Plaintiff Jamisi Jermaine Calloway raises multiple claims against Defendants arising out of Defendants' alleged use of excessive force against him, and Defendants' alleged deliberate indifference to his serious medical needs between March 2001[2] and

---

[1]There are seven individual Defendants – Thomas Chalk, Roderick County, Fred Gray, Tony Lumb, James Rael, Kenneth Brooks, and Fatmata Longstreth – and three entity Defendants – Contra Costa County, the Contra Costa County Sheriff's Department, and the California Department of Corrections and Rehabilitation (CDCR).  Chalk, County, Gray, and Lumb each filed separate Motions; Rael, Brooks, and Longstreth filed one Motion; Contra Costa County and the Contra Costa County Sheriff's Department filed one Motion; and CDCR filed a Motion.  Except where necessary, they are referred to collectively as "Defendants."

[2]In Plaintiff's briefs, he discusses "relevant events prior to March 14, 2001," namely, the fact that his dialysis access became clotted and he had to be hospitalized in January 2001.  *See* Plaintiff's Memo in Opposition to Motion for Summary Judgment by Contra Costa County and Contra Costa County Sheriff's Department at 2-3.  Plaintiff offers evidence that at that time, a doctor at Novato Community Hospital ordered that he not be handcuffed behind his back, as it would cause problems with his dialysis access.  *See* McDonald Decl. Ex. 6.  Further, in his own declaration, Plaintiff alleges that he was not provided dialysis treatment at other times including November 2000, April 2001, September 2001,

**United States District Court**
For the Northern District of California

1   April 2002.

2        Since 1999, Plaintiff has been diagnosed with end-stage renal failure.  Calloway Decl. at ¶ 2.

3   He is required to undergo dialysis every two to three days.  *Id.*  A vascular access is necessary for

4   dialysis treatment.  Haut Decl. at ¶ 6.  There are three types of vascular access: (1) arteriovenous

5   fistula, which is a connection directly between an artery and a vein, typically in the patient's

6   forearm; (2) arteriovenous graft, which is created by implanting a synthetic tube under the patient's

7   skin which is used rather than a vein for needle placement; and (3) venous catheter, which is a

8   synthetic tube that is inserted in a vein in the patient's neck, chest, or leg; once a catheter is placed,

9   needle insertion is not necessary.  *Id.*

10        Beginning in 2000, Plaintiff's dialysis access was a fistula and a graft in his left forearm.

11   Calloway Decl. at ¶ 3.

12   **1.  Alleged Excessive Force**

13        On March 14, 2001, Plaintiff was scheduled for dialysis at San Quentin.  Calloway Decl. at ¶

14   8.  Before it took place, he was removed from the custody of the California Department of

15   Corrections and Rehabilitation (CDCR) at San Quentin and delivered to the custody of Contra Costa

16   County for a preliminary hearing on then-pending criminal charges.  Fourth Amended Complaint

17   (hereinafter "Compl.") at ¶ 21.  Plaintiff states that he told the officers at San Quentin that he needed

18   dialysis and, based on his prior experiences, he did not think dialysis was available at the County

19   Jail.  Calloway Decl. at ¶ 8.  Plaintiff left San Quentin and was taken to the Martinez Detention

20   Facility (MDF), which is operated by the Contra Costa County Sheriff's Office.  Gray Decl. at ¶ 2.

21   When he arrived, he was told by the jail's medical staff that they did not have dialysis available.

22   Callaway Decl. at ¶ 8.

23        During court proceedings that day, Plaintiff's attorney informed the court that Plaintiff was in

24   need of dialysis treatment.  Compl. at ¶ 25.  The court ordered Plaintiff to be taken to dialysis at

25    

26   January 2002, August 2002, and November 2002.  *See* Calloway Decl. at ¶¶ 21-39.

     However, the claims in the operative Complaint are quite clearly based only on events between

27   March 2001 and April 2002.  In fact, the Complaint identifies three "incidents" taking place March 14-16, 2001; February 21-25, 2002; and March 4-April 2, 2002.  Thus, the Court will not consider events

28   prior to March 2001 (or outside of the three incidents identified in the Complaint), except to the extent
necessary to understand or clarify allegations during the relevant time frame.

County Hospital. *Id.* at ¶ 26.  However, County Hospital did not have dialysis facilities.  Smith Decl. at ¶ 5; McDonald Decl. Ex. 13 (Kramer Depo. at 83).  Plaintiff did not receive dialysis that day.  Callaway Decl. at ¶ 10.

The next day, March 15, 2001, Plaintiff was taken to Defendant Thomas Chalk.  Callaway Decl. at ¶ 11.  Chalk is a Contra Costa County Sheriff's Deputy, who at the time was assigned to the Transportation Division; his duties included transporting inmates to and from court, prison, and medical appointments.  Knapp Decl. Ex. L (Chalk Decl. at ¶ 1).  Chalk was assigned to transport Plaintiff to San Quentin for a dialysis appointment.  *Id.* at ¶ 2.  While they walked to the release window at MDF, Plaintiff asked Chalk if he was being taken to dialysis in the County.  Calloway Decl. at ¶ 11.  Chalk said no, he was being taken to San Quentin.  *Id.*  Plaintiff stated that he would not agree to be sent back to San Quentin.  "I was familiar with schedule [sic] at the San Quentin dialysis center and knew that if I was transported back to San Quentin I would not receive dialysis that day because it was not my regular scheduled day."  *Id.* Plaintiff told Chalk that he had a court order to get dialysis in the County.  *Id.*  Chalk told Plaintiff that he would have to go to San Quentin because the County Hospital did not have facilities for dialysis appointments.  Chalk Decl. at ¶ 3, Knapp Decl. Ex. A (Calloway Depo. 7/7/06 at 146).  Chalk testified that he never saw the court order.  McDonald Decl. Ex. 9 (Chalk Depo. at 61).  According to Chalk, Plaintiff "said that he would not go to San Quentin no matter what.  He became loud and appeared agitated, began cursing, and refused to sign his release forms and said he would not go."  Chalk Decl. at ¶ 4.  "He was being loud, doing the clenching of the hands, just all the signs that we look for that indicate a potential for this inmate to cause us some physical harm.  We – we just try – I tried to explain to him the fastest way to get dialysis is to go to San Quentin where your appointment is, or where you've been scheduled to go.  That didn't work."  McDonald Decl. Ex. 9 (Chalk Depo. at 62).

Chalk told Plaintiff to sit on a bench, and walked into an office to get the release papers for his transfer to San Quentin.  Calloway Decl. at ¶ 12.  Chalk called Plaintiff over to the office window to sign the papers, but Plaintiff remained seated on the bench and repeated that he would not agree to sign anything or go anywhere until he got dialysis.  *Id.*

At that point, Sergeant Fred Gray came to the office window and asked Plaintiff if he was

**United States District Court**
For the Northern District of California

causing the deputies any problems. *Id*. at ¶ 13. Gray, who is now retired, was at the time the Processing Sergeant at the MDF; his responsibilities included supervising the process of temporarily or finally releasing inmates from the MDF. Gray Decl. at ¶¶ 1-2. Plaintiff told Gray that he had a court order to remain in the County for dialysis. Calloway Decl. at ¶ 13. According to Plaintiff, "Sergeant Gray got mad, and he and Deputy Chalk walked around from the office to the release room where I was sitting. Sergeant Gray stood in front of me and ordered me to stand up and 'cuff up.' I remained sitting and told them again that I wanted to see a doctor and that I had a court order for the officers to take me to dialysis right away." *Id*. It is standard procedure for inmates to be handcuffed for transportation outside the facility. Knapp Decl. Ex. M (County Decl. at ¶ 4).

Deputy Sheriff Roderick County approached the area and observed the officers and Plaintiff "engaged in a loud dispute." County Decl. at ¶ 2. According to County, Plaintiff was loud and appeared agitated. Sergeant Gray was standing 5-7 feet from him, and warned him several times that if he refused to stand and be handcuffed, he would be shot with a taser gun. *Id*. at ¶¶ 2-3; Calloway Decl. at ¶ 14. Calloway stated that he had a court order, and that "if he had to shoot me then just go ahead, because I would not sign the papers until I got dialysis." Calloway Decl. at ¶ 14. Gray pointed the taser at Plaintiff and told him again that he would be tased if he did not "cuff up." County Decl. at ¶ 5. Plaintiff continued to refuse, and Gray shot him with the taser. *Id*.

Gray completed an Incident Report on the tasing. In it, he stated that Plaintiff refused to complete the release process and go to San Quentin for dialysis, despite being told that there was no dialysis available at County Hospital. Gray reported, "[h]e refused to stand up from the bench. Deputy Chalk and County ordered him several times to comply with their request to walk to transportation. He refused, shouting "I'm not going anywhere mother fuckers I'm staying right here." Not wanting my deputies to have a physical altercation with Calloway, I retrieved the taser and went to the release bench. I explained to Calloway that he had to go for dialysis outside of our facility. He said "I aint moving from this bench asshole go ahead and shoot me with that fuckin thing it don't scare me." I fired the taser, and Calloway immediately fell (approx. 1 foot) to the carpet. He was handcuffed without further incident and returned to San [Quentin]." Rubin Decl. Ex. G.

4

United States District Court
For the Northern District of California

At his deposition, Gray stated that the alternative to tasering Plaintiff was a physical confrontation.  "And I didn't want to – I didn't want to do that.  It's not a good idea to have deputies and inmates fight . . . And I thought to choose to use that, deploy that, as the safest measure, for everybody concerned, actually."  Knapp Decl. Ex. I (Gray Depo. at 27).

Deputy Tony Lumb, who was working as an escort officer at MDF that day, heard the commotion and ran down the hallway towards it.  Knapp Decl. Ex. K (Lumb Depo. at 17).  He arrived on the scene after Plaintiff was tased.  Lumb did not recall who was involved in handcuffing Plaintiff.  *Id*. at 19.  Lumb testified to knowing very little about the incident.

After falling to the floor, Plaintiff states that he had a seizure.  "I blacked out for about ten seconds, and then everything was blurry.  The stun gun blast was extremely painful."  Calloway Decl. at ¶ 15.  According to Plaintiff, he was grabbed by a number of deputies, flipped onto his stomach, and could feel the deputies on top of him "hitting me, kneeing my back and my side, and grabbing at my arms and legs.  They wrenched my arms behind my back and handcuffed me behind my back and put shackles on my feet.  I could hear Deputy Chalk, Sergeant Gray, and the other officers."  *Id*.  County states that he did not kick, punch, or strike Plaintiff at any time.  "The only physical contact that I personally had with Mr. Calloway was to grasp his extremities and place them into position to assist in applying restraints on Mr. Calloway who was not resisting."  County Decl. at ¶ 7.  Likewise, Chalk states that he did not, nor did he see anyone hit Plaintiff, curse at him, "or physically restrain him in any way other than to put the cuffs on him after he was tased."  Chalk Decl. at ¶ 6.  Plaintiff states that the deputies teased him and called him a "cry baby."  Calloway Decl. at ¶ 16.  At his deposition, Plaintiff testified that he could not recall what the deputies were saying, but that they were "talking smack" about him.  Knapp Decl. Ex. A (Calloway Depo. 7/7/06 at 132; Calloway Depo. 7/14/06 at 246).  Plaintiff testified that he couldn't see anyone and couldn't tell who was talking.  *Id*.

After Plaintiff was shot with the taser gun, central control paged for an intake nurse to respond to the release window.  Longstreth Depo. at 33.  The intake nurse on duty, Fatmata Longstreth, ran to see what was going on.  *Id*.  Longstreth did not recall whether Plaintiff was handcuffed when she arrived, or who else was present.  She testified that when she came upon

United States District Court
For the Northern District of California

Plaintiff after being paged, he was lying on the floor, yelling and cursing. *Id*. at 35, 41. Plaintiff was conscious and responding to questions. *Id*. at 41. Longstreth removed the taser darts pursuant to policy. *Id*. at 34. She testified that the deputies took Plaintiff to Safety Cell 2 and placed Plaintiff in ankle restraints. The deputies called her to check his restraints, to ensure that they were not impeding circulation. *Id*. She wanted to continue doing further testing, but Plaintiff said that he didn't need her help. *Id*. at 42. When she returned to the safety cell two hours later, she was told that Plaintiff had been taken to San Quentin. *Id*. at 36.

With respect to the handcuffing, Plaintiff's deposition testimony is somewhat inconsistent with his declaration. At his deposition, Plaintiff testified that after being shot with the taser, he lost consciousness and had no memory of what occurred before the nurse arrived. Knapp Decl. Ex. A (Calloway Depo. 7/7/06 at 155). He remembered having pain in his arms and feet. *Id*. He remembered that deputies were twisting his arms behind his back, tugging on his arms and legs, and kneeing him in the back and in the side. Knapp Decl. Ex. A (Calloway Depo. 7/14/06 at 242). Plaintiff testified that he did not feel any other form of physical contact. *Id*. at 244. He testified that he did not know whether Gray or County were involved in physically handling him. *Id*. at 245. However, he said that he knew Chalk was involved. *Id*. at 246.

Plaintiff states that after the taser darts were pulled out, the deputies picked him up by his handcuffed arms and legs and carried him to an isolation cell, where he was placed face-down on the floor. Calloway Decl. at ¶ 16. Then they sat him up so that he could be examined by Nurse Longstreth. Plaintiff declares that he told her that his chest hurt, that he needed dialysis, and that the cuffs were too tight and that his shunt was in his arm. *Id*. According to Plaintiff, the officers continued to tease him, called him an asshole, and Deputy Chalk said, "All that and your black ass is still going back to San Quentin." *Id*. Chalk denies having made this statement. Knapp Decl. Ex. H (Chalk Depo. at 74). Plaintiff states that Longstreth put her fingers under the cuff and said that it was fine; "[a]lthough I complained to the nurse about injury to my graft, I remained handcuffed behind my back." *Id*. At his deposition, Plaintiff testified that Longstreth was ignoring his complaints and so he told her that he didn't need her help. Knapp Decl. Ex. A (Calloway Depo. 7/7/06 at 133).

6

United States District Court
For the Northern District of California

At that point, Plaintiff states that he was picked up by his handcuffed arms and legs and carried to a van.  He was transported to San Quentin with his hands cuffed behind his back. Calloway Decl. at ¶ 17.  Upon arrival at San Quentin, he was uncuffed and went to the dialysis unit, but he was not given dialysis.  *Id*. at ¶ 19.  Plaintiff states that he received dialysis the next day, March 16, 2001.  *Id*. at ¶ 20.  Medical records indicate that his graft was functioning normally on March 16.  Knapp Decl. Ex. D (Calvo Depo. at 206); Ex. G (San Quentin medical record).  Further, there was no record of any injury sustained in the March 15 incident – there was no bruising or complaints of pain other than leg cramps.  Calvo Depo. at 207.  Plaintiff testified that his fistula was damaged by the March 15 incident, but admitted that the graft was still working.  McDonald Decl. Ex. 3 (Calloway Depo. 9/22/06 at 385-86).  However, he said that "a couple of months after that the graft like it clotted real easily and it stopped working."  *Id*. at 386.[3]

In addition to the events of March 15, 2001, Plaintiff also alleges that being restrained by handcuffs behind his back on various occasions constituted excessive force.  A doctor at Novato Community Hospital instructed in January 2001 that Plaintiff should not be handcuffed behind his back because this was likely to cause blockage in his dialysis access.  McDonald Decl. Ex. 6. Plaintiff declares that "I told custody officers at San Quentin that the doctor had instructed that I not be handcuffed this way because it would interfere with my dialysis access in my left forearm, but the officers at San Quentin continued to handcuff me behind my back."  Calloway Decl. at ¶ 5.  Plaintiff states that he was also handcuffed behind his back while housed at the County Jail.  *Id*. at ¶ 7.  Chalk testified that he was not aware that Plaintiff had a shunt or graft in his arm.  Knapp Decl. Ex. H (Chalk Depo. at 58).  Chalk also testified that he had never received any instruction from any source

---

[3]In July 2001, Plaintiff fell down some stairs at San Quentin while his hands were shackled behind his back.  At his next dialysis session, his graft could not be cannulated.  McDonald Decl. Ex. 7 (Novato Community Hospital records).  On July 19, he was brought to the hospital for fistulogram with thrombolysis and angioplasty, but he refused the procedure because he wanted to be placed under general anesthetic.  *Id*.  Plaintiff was thus admitted to the ICU for placement of a femoral vein catheter for emergency dialysis.  *Id*.  An attempt to declot his graft failed, and he was returned to San Quentin and dialyzed via the catheter.  Post-dialysis, he developed sepsis.  He returned to the hospital, where the catheter was pulled and a new one was placed.  He was then admitted to the ICU for emergency dialysis and antibiotics.  *Id*. at Ex. 8.  On July 28, 2001, Plaintiff had surgery for placement of a perm-cath in his right internal jugular vein.  *Id*.  He was then discharged to San Quentin with instructions to resume dialysis on Tuesdays, Thursdays, and Saturdays.  *Id*.

**United States District Court**
For the Northern District of California

1   not to handcuff Plaintiff behind his back.  McDonald Decl. Ex. 9 (Chalk Depo. at 70).  The County

2   Defendants assert that there is no evidence that the order that Plaintiff should not be handcuffed

3   behind his back was ever transmitted to Contra Costa County medical or custodial personnel.

4   County Defendants' Reply at 1.

5   **2.  Alleged Deliberate Indifference to Plaintiff's Medical Needs**

6           Plaintiff's Declaration and briefing discuss facts allegedly demonstrating indifference to his

7   medical needs outside of the "incidents" identified in the Complaint.  For instance, Plaintiff alleges

8   that in November 2000, he missed a scheduled dialysis treatment at San Quentin because he was

9   sent to the County for a court appearance, and did not receive dialysis until two days later when he

10  returned to San Quentin.  Calloway Decl. at ¶ 21.  As noted, the operative Complaint only alleges

11  indifference to medical needs based on three incidents, all occurring between March 2001 and April

12  2002; thus, these facts will not be recited.[4]

13  a.    March 14-16, 2001 Incident

14          Plaintiff alleges that the events described above also constituted deliberate indifference to his

15  medical needs, because Defendants caused him to miss his scheduled dialysis appointment at San

16  Quentin on March 14, failed to locate dialysis for him in Contra Costa County on March 15 and

17  transported him back to San Quentin where there were no dialysis appointments available.  Thus,

18  Plaintiff went four days without dialysis.  Calloway Decl. at ¶ 23.  According to Plaintiff, Defendant

19  Rael, who was the Medical Director for Contra Costa County detention facilities, was advised by a

20  nurse on March 14 that Plaintiff had arrived at the jail and needed dialysis that day, yet he took no

21  action to arrange dialysis for Plaintiff.  Compl. at ¶¶ 23-24.

22          The normal procedure in Contra Costa County was for medical staff to set up medical

23  appointments for inmates.  Knapp Decl. Ex. H (Chalk Depo. at 53).  The County Jail did not have

---

[4]Defendants also offer evidence regarding Plaintiff's medical treatment which goes outside the "incidents" identified in the Complaint.  For example, Plaintiff testified that he sometimes skipped dialysis treatments if he had a visitor on the same day as a treatment.  Knapp Decl. Ex. K (Calloway Depo. 7/7/06 at 55).  He also testified that he missed dialysis because he refused to be transported to his treatment in a van that had bloody gauze on the seats and the floor.  *Id*. at 176.  In addition, in January 2002, Plaintiff refused to have his catheter replaced when it was pulled out by another inmate.  See Maiorino Decl. at Ex. A.  However, this evidence also goes beyond the allegations in the Complaint.

dialysis facilities.  McDonald Decl. Ex. 1 (Barnhart Depo. at 31).  The County Hospital also did not have dialysis available.  Knapp Decl. Ex. A (Rael Depo. at 92).  Thus, when County medical staff were informed that there was a state prisoner coming who needed dialysis, they would start calling around to local providers.  *Id*. at 32; McDonald Decl. Ex. 15 (Rael Depo. at 91-92).  Arrangements were made by the nurse or nurse practitioner, the physician on duty, or Rael himself, depending on who was on site at the time.  Rael Depo. at 92.  The prisoner's intake form would say that the inmate was a dialysis patient and state his dialysis schedule.  Knapp Decl. Ex. C (Barnhart Depo. at 31).  There was no written policy as to provision of dialysis treatment for an inmate who did not already have an established treatment provider in the County.  *Id*. at 32.

b.    February 21-25, 2002 Incident

On February 21, 2002, Plaintiff was brought into the custody of Contra Costa County.  McDonald Decl. Ex. 26 (Contra Costa County Detention Facilities medical chart).  He was scheduled to be dialyzed that day at Corcoran State Prison, but did not receive the treatment due to his transfer to the County.  Calloway Decl. at ¶ 31.  Plaintiff alleges that Dr. Brooks was advised by a nurse that Plaintiff had arrived at the jail and had missed his scheduled dialysis, but that Dr. Brooks did not arrange for Plaintiff to receive dialysis.  Compl. at ¶¶ 61-62.

On February 22, Dr. Brooks ordered Plaintiff to be taken to the Doctor's Hospital emergency room.  Knapp Decl. Ex. B (Brooks Depo. at 57).  A deputy was informed that Plaintiff would be admitted and receive dialysis by the next day.  *Id*.

According to Plaintiff, "[t]he County did not provide me with dialysis treatment until I was so sick that I had to be admitted to the emergency room of Doctors Medical Center with vomiting, chills and an infection on February 22, 2002."  Calloway Decl. at ¶ 31.

On February 25, 2002, Plaintiff returned to the Contra Costa County Jail from Doctor's Medical Center with no orders.  McDonald Decl. Ex. 26.

c.    March 4-April 2, 2002 Incident

Plaintiff alleges that on March 4, 2002, Drs. Rael and Brooks were notified that Plaintiff was being transferred to the County Jail and had not been dialyzed since March 2.  Compl. at ¶ 69.  Plaintiff alleges that they failed to arrange dialysis for him.  *Id*. at ¶ 70.

United States District Court
For the Northern District of California

On March 5, 2002, Plaintiff was transferred from Corcoran State Prison to the custody of Contra Costa County.  A note in his medical chart stated that he was due for dialysis on March 6, and that he was supposed to be dialyzed Mondays, Wednesdays, and Fridays.  Dr. Brooks was contacted, and he contacted Dr. Hernandez in the Contra Costa County Regional Medical Center emergency room.  McDonald Decl. Ex. 16 (Contra Costa County Detention Facilities medical chart). The note states that Plaintiff would be evaluated by Dr. Hernandez and then possibly sent to Doctor's Medical Center in San Pablo for dialysis.  *Id*.  In other words, Dr. Brooks ordered that Plaintiff be sent to the County Hospital, despite the fact that it had no dialysis facilities.  Knapp Decl. Ex. A (Rael Depo. at 123).  Dr. Brooks testified that to the best of his knowledge, Plaintiff was not in distress at that time, and it was his understanding that Dr. Hernandez would assume responsibility for obtaining dialysis for Plaintiff.  Walker Decl. Ex. C (Brooks Depo. at 61).

On March 7, 2002, Plaintiff was taken to Doctor's Medical Center with a fever and sepsis. Plaintiff stated that his graft had been clotted for five months.  The doctor noted that Plaintiff was then dialyzing through a PermCath and was in need of more permanent access.  McDonald Decl. Ex. 18 (medical records).  Plaintiff agreed to placement of a left upper arm graft.  *Id*.  Plaintiff had not been dialyzed for three days, because he was sent to the Contra Costa Regional Medical Center for dialysis despite the fact that there were no dialysis facilities there, and his potassium was elevated. *Id*.  Plaintiff was dialyzed that day.  Calloway Decl. at ¶ 33.

On March 11, 2002, Plaintiff returned to the County Jail from Doctor's Medical Center after having shunt placement and dialysis.  McDonald Decl. Ex. 16.  On March 14, 2002, Dr. Rael gave orders for Plaintiff to receive medication and to be taken to Doctor's Medical Center the following day for dialysis.  *Id*.

Plaintiff declares that he did not receive his scheduled dialysis on March 15 because no one transported him from the County Jail to his dialysis appointment.  Calloway Decl. at ¶ 34.  Plaintiff was admitted to Doctor's Medical Center on March 15.  Walker Decl. Ex. E (Doctor's Medical Center records).  He was dialyzed there on the 15th, 16th, and 19th without difficulty.  *Id*.  He was discharged back to MDF on March 19.  *Id*.  Dr. Morrissey of Doctor's Medical Center called Dr. Rael regarding the need to arrange outpatient dialysis for Plaintiff.  Rael Depo. at 138.  Dr. Rael

United States District Court
For the Northern District of California

1  testified that the County had been unable to find a location for Plaintiff's dialysis, despite their best

2  efforts, because no facility was willing to accept him.  *Id*. at 140, 143-44.  Dr. Rael testified that he

3  obtained a list of dialysis centers in the Bay Area and began calling each of them, but they lacked

4  capacity (there were no available spots for Plaintiff).  *Id*. at 170-71.

5          According to Plaintiff, after he was discharged from Doctor's Medical Center on the 19th, he

6  remained at the County Jail and was not provided dialysis treatment until March 22, 2002, when he

7  returned to Corcoran.  Calloway Decl. at ¶ 35.  Further, on March 30, he was scheduled for dialysis

8  but did not receive it because he was transferred to the County Jail that day.  *Id*. at ¶ 36.  Plaintiff

9  states that the County did not arrange dialysis treatment for him until April 2.  *Id*. at ¶ 37.

10         On April 1, 2002, a note in Plaintiff's chart states that Plaintiff's potassium level was 5, and

11  Dr. Brooks had been notified.  No orders were given as Plaintiff would have dialysis the following

12  day.  McDonald Decl. Ex. 16 (Contra Costa County Detention Facilities medical chart).

13         On April 2, Plaintiff was taken to Mt. Diablo Medical Center with fever, sepsis, and a

14  grossly infected left upper arm graft.  McDonald Decl. Ex. 20 (Mt. Diablo medical records).  He was

15  admitted to the ICU for emergency dialysis via PermCath.  *Id*.  He was discharged on April 16,

16  2002.  McDonald Decl. Ex. 22 (discharge summary).

17  d.     Hygiene[5]

18         Plaintiff alleges that he was not allowed to shower every day while incarcerated at San

19  Quentin and the County Jail.  Calloway Decl. at ¶ 41.  He also alleges that he was not able to change

20  into a clean shirt every day, and that the dressings surrounding his chest catehter were not changed

21  daily and that he was not provided with medication to disinfect the catheter site.  *Id*. at ¶¶ 42-45.

22  e.     Expert Testimony

23         The parties offer dueling expert opinions on whether Plaintiff received adequate medical

24  care.

25         According to Dr. Lewis Haut, a nephrologist retained by CDCR, the most common types of

27          [5]As will be discussed, Defendants object to Plaintiff's proffer of evidence about hygiene, as the Complaint does not state a claim for inadequate hygiene.  Those objections are overruled, because the hygeine situation is probative of Defendants' attention to Plaintiff's medical needs.  However, the Court will not consider them as a separate claim.

**United States District Court**
For the Northern District of California

1   complications from vascular access for dialysis are infection and blood clotting.  Haut Decl. at ¶ 7.

2   According to Dr. Haut, "Plaintiff experienced many difficulties from 2000 to the present related to

3   the attempts to establish and maintain vascular access for dialysis.  This is a problem that is common

4   to the majority of dialysis patients.  When a functioning fistula or graft is not available, catheters are

5   necessary.  Dialysis patients will often suffer from clotted access sites or get infections of both the

6   access and tunneled catheters.  Occasionally, dialysis patients will become bacteremic from their

7   access infections, which forces the removal of any catheter and the use of systemic antibiotics.

8   Again, these are common occurrences amongst dialysis patients even when those patients are

9   receiving adequate medical care.  Simply because they occur does not mean that the dialysis patient

10  is receiving inadequate medical care.  In reviewing his medical records, Plaintiff suffered from these

11  types of medical problems while in the custody of CDCR.  However, in my opinion, these problems

12  were dealt with promptly, efficiently, and effectively."  *Id*. at ¶ 11.  Further, according to Dr. Haut,

13  "[t]he treatment of hemodialysis patients is tedious and difficult.  It is not uncommon for

14  hemodialysis patients to miss their dialysis treatment due to inadvertent mistake or human error.

15  Simply because a patient misses their hemodialysis treatment does not mean that malpractice or

16  malfeasance has been committed."  *Id*. at ¶ 12.  Dr. Haut opined that "[d]uring his incarceration,

17  Plaintiff received very good medical care that would have been as good or better than the care a

18  similarly situated hemodialysis patient that was not incarcerated could have expected to receive in

19  the medical community."  *Id*. at ¶ 10.  Dr. Haut also stated that "when they discovered they made a

20  mistake – someone somewhere blew it, admittedly, some clerk or someone or the doctor perhaps or

21  the nurse.  It wasn't communicated, Hey, this guy needed dialysis.  But they discovered it and they

22  didn't say 'The heck with it, let him rot,' they said 'Oh, my God, we've got to get him to dialysis.'

23  What did they do?  They sent him to the emergency room, which is the best way to get someone

24  dialysis."  Maiorino Decl. Ex. C (Haut Depo. at 69).

25          The County Defendants offer the opinion of George Kaysen, M.D., who reviewed Plaintiff's

26  records and opined that there was no deliberate indifference to Plaintiff's medical needs.  Knapp

27  Decl. Ex. G (Kaysen Depo. at 12-13).  According to Dr. Kaysen, the County "had arrangements with

28  existing hemodialysis facilities in Contra Costa to accept their patients on, I presume, a fee basis to

dialyze them, and that system had functioned for them.  That is certainly an acceptable way of dealing with the needs of a chronic dialysis patient who is going to be a transient."  *Id*. at 17.  With regard to the March 6-7, 2002 incident, Dr. Kaysen stated that "they attempted to get him dialyzed in their network of dialysis units which were available to them.  They were unable to do so.  They sent him to an emergency room for evaluation. . . .   this is really an emergency treatment, and the correct emergency treatment was provided to him.  Again, not the most efficient way of delivering care . . . could be designed better, but managed to deal with the problem."  *Id*. at 23-24.  Further, Dr. Kaysen opined that the fact that a dialysis patient is hospitalized with acute illness "is the usual; it's not an uncommon event."  *Id*. at 34.  Dr. Kaysen opined that two out of three of Plaintiff's hospitalizations were not due to missed dialysis treatments, but to infections, which are common causes of morbidity in dialysis patients.  *Id*. at 42, 46.

Plaintiff offers the opinions of Drs. Michael Blumenkrantz and Robert Greifinger.  Dr. Blumenkrantz is a nephrologist.  Blumenkrantz Decl. at ¶ 1.  He testified that the major cause of Plaintiff's infections was lack of hygiene.  Maiorino Decl. Ex. E (Blumenkrantz Depo. at 29).  He also testified that Plaintiff's graft became occluded in part because of being handcuffed, and that if Plaintiff had a functioning arm graft "he wouldn't have those issues with the subclavians and the septicemia and the ineffective dialysis and the lack of good access."  *Id*. at 31.  Dr. Blumenkrantz testified that the duration of Plaintiff's dialysis was "grossly inadequate" given his muscle mass and renal function.  *Id*. at 40-41.  He stated that "[b]etween January 2001 and April 2002, Mr. Calloway was hospitalized on at least seven occasions, several of which resulted from Mr. Calloway's delayed access to dialysis.  The repeated need to hospitalize Mr. Calloway when he presented with symptoms resulting from severe hyperkalemia (excessive potassium in his blood) and/or infection reveals that the correctional health care providers failed to ensure that Mr. Calloway had adequate and timely dialysis as well as appropriate measures to avoid infection."  Blumenkrantz Decl. at ¶ 4.

Dr. Greifinger served as the Deputy Commissioner/Chief Medical Officer of the New York State Department of Correctional Services and now is a consultant on the design and management of correctional institution health care systems.  Greifinger Decl. at ¶ 1; *id*. at Ex. A. Dr. Greifinger testified that he is an expert "on the narrow area of safely shackling inmates with physical

United States District Court
For the Northern District of California

1  disabilities," and opined that Plaintiff should not have been handcuffed behind his back.  McDonald

2  Decl. Ex. 12 (Greifinger Depo. at 68).  He also testified that he believed Plaintiff should not have

3  been tased; "I think that someone who's on dialysis, I think it's very risky, putting him in

4  unnecessary harm's way."  *Id*.  Further, Dr. Greifinger's declaration contains the same statement

5  quoted above, regarding the overall inadequacy of Plaintiff's medical care.  Greifinger Decl. at ¶ 4.

6  ## LEGAL STANDARD

7  **1. Summary Judgment**

8   Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary

9  judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any

10  material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v.*

11  *Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is

12  such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

13  *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment may be granted in favor of a defendant

14  on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district

15  court that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S.

16  at 325.

17   To withstand a motion for summary judgment, the non-movant must show that there are

18  genuine factual issues which can only be resolved by the trier of fact.  *Anderson*, 477 U.S. at 250.

19  The nonmoving party may not rely on the pleadings but must present specific facts creating a

20  genuine issue of material fact.  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,

21  630 (9th Cir. 1987).  The court's function, however, is not to make credibility determinations.

22  *Anderson*, 477 U.S. at 249.  The inferences to be drawn from the facts must be viewed in a light

23  most favorable to the party opposing the motion.  *T.W. Elec. Serv.*, 809 F.2d at 631.

24   If the case is not fully adjudicated by a motion for summary judgment, the court is

25  empowered to grant summary adjudication as to specific issues if it will narrow the issues for trial.

26  See Fed. R. Civ. P. 56(d).  Rule 56(d) expressly provides that:

27   If on motion under this rule judgment is not rendered upon the whole case
    or for all the relief asked and a trial is necessary, the court at the hearing
28   of the motion, by examining the pleadings and the evidence before it and

by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.  It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just.  Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**2. Judgment on the Pleadings**

Under Federal Rule of Civil Procedure 12(c), any party may move for judgment on the pleadings at any time after the pleadings are closed but within such time as not to delay the trial.  Fed. R. Civ. P. 12(c).  "For the purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false."  *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.1990).  Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."  *Id.*  When brought by the defendant, a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is a "means to challenge the sufficiency of the complaint after an answer has been filed."  *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090, 1115 (C.D. Cal. 2004).  A motion for judgment on the pleadings is therefore similar to a motion to dismiss.  *Id.*  When the district court must go beyond the pleadings to resolve an issue on a motion for judgment on the pleadings, the proceeding is properly treated as a motion for summary judgment.  Fed. R. Civ. P. 12(c); *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1301 (9th Cir.1982).

**ANALYSIS**

**A.      Plaintiff's Objections to Defendants' Evidence**

1.      Plaintiff objects to the Declaration of Fred Gray in its entirety, on the ground that Gray does not state that he has personal knowledge of any of the facts in his declaration.  Under Federal Rule of Evidence 602, a witness may not testify as to a matter "unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own

United States District Court
For the Northern District of California

testimony."  Although Gray does not explicitly state that the facts in his declaration are based on personal knowledge, his testimony (the substance of the declaration) shows that he was present at the March 15 incident and has personal knowledge of what transpired.  Thus, the objection is OVERRULED.[6]

Plaintiff also objects to Exhibit A of the Gray Declaration, which is a copy of the incident report on the tasing, on hearsay grounds.  Gray declares that the report was made near the time of the event and that "[s]uch reports were required by the policies of the MDF to be complete and accurate descriptions of the incident they report on, and copies were filed in the booking files of the inmate or inmates involved and are the official record of the incident for the Sheriff's Office."  Gray Decl. at ¶ 3.  Thus, the report is admissible as a business record, *see* Fed. R. Evid. 803(6), and the objection is OVERRULED.

2.   Plaintiff objects to the Declaration of Jacqueline Rubin in its entirety, on the ground that Rubin does not state that she has personal knowledge of any of the facts in her declaration.  *See* Fed. R. Evid. 602.  It is true that Rubin does not explicitly state that the facts in her declaration are based on personal knowledge.  However, she states that she is an Administrative Lieutenant in the Custody Services Bureau of the Contra Costa County Sheriff's Office, and that her duties in that position include supervising units responsible for field training, policy and procedure, and that she acts as the custodian of records for the Bureau when appropriate.  Rubin Decl. at ¶ 1.  This is sufficient to demonstrate her personal knowledge of the Sheriff's Department's grievance procedure, and of the records of grievances filed and exhausted by Plaintiff.  Thus, the objection is OVERRULED.

3.   Plaintiff objects to Exhibit D of the Declaration of Bernard Knapp in Support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is an excerpt from the deposition of Donald Calvo, M.D., regarding Plaintiff's medical care.  Plaintiff objects on the grounds of relevance, lack of foundation/lack of personal knowledge, hearsay, and improper lay witness

---

[6]Here and elsewhere, Plaintiff also objects that the evidence lacks foundation pursuant to Federal Rule of Evidence 901(a).  However, Rule 901 deals with proper authentication of evidence, and Plaintiff does not explain how or why the evidence is improperly authenticated.  Thus, the objection is OVERRULED to the extent that it relies on Rule 901.

testimony (because the witness has not been qualified as an expert).  The relevance objection lacks merit – Plaintiff's medical care is directly at issue in this case.  However, the lack of foundation and hearsay objections are valid – from the excerpt, it is unclear who Dr. Calvo is, the basis for his statements, and any applicable hearsay exception for the statements he attributes to others (his testimony appears to consist of reading from Plaintiff's medical chart).  Thus, those objections are SUSTAINED.

4.  Plaintiff objects to Exhibit H of the Knapp Declaration in support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is an excerpt from Chalk's deposition.  Plaintiff objects on the grounds of lack of foundation/personal knowledge.  The substance of Chalk's testimony was the events of March 15, 2001, and his testimony shows that he was personally involved.  Thus, pursuant to Rule 602, the objections are OVERRULED.

5.  Plaintiff objects to Exhibit I of the Knapp Declaration in support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is an excerpt from Gray's deposition.  Plaintiff objects on the ground of lack of foundation/personal knowledge.  The substance of Gray's testimony was Gray's job duties and the events of March 15, 2001, and his testimony shows that he was personally involved.  Thus, pursuant to Rule 602, the objection is OVERRULED.

6.  Plaintiff objects to Exhibit J of the Knapp Declaration in support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is a copy of the incident report on the tasing, and Plaintiff objects on the grounds of lack of foundation/personal knowledge and hearsay.  No foundation is laid for the exhibit here, so the objection is SUSTAINED, but the incident report comes in as an exhibit to the Gray Declaration, so the objection is really moot.

7.  Plaintiff objects to Exhibit L of the Knapp Declaration in support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is a Declaration by Chalk.  Plaintiff objects on the grounds of lack of foundation/personal knowledge.  The substance of the declaration is the events of March 15, 2001, and it is clear from Chalk's testimony that he was personally involved.  Thus, under Rule 602, the objection is OVERRULED.  Plaintiff also specifically objects to paragraph 5 of the declaration on relevance grounds.  This paragraph states: " At the time of the incident described above, I understood Callaway was in the jail on charges of

attempted murder.  I had transported Callaway to the jail from the state prison at Corcoran, and I believed he was serving a long sentence there.  Callaway was about 5'8" and at that time weighed approximately 250 pounds and was in good physical condition.  It is important to avoid physical handling of an inmate who is combative where possible to avoid injury to the inmate or jail staff."  This information is probative of one of the issues in this case – namely, whether Callaway was dangerous or physically threatening and thus whether the use of force was justified.  Accordingly, the objection is OVERRULED.

8.   Plaintiff objects to Exhibit M of the Knapp Declaration in support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is a Declaration by Roderick County.  Plaintiff objects on the grounds of lack of foundation/personal knowledge.  The substance of the declaration is the events of March 15, 2001, and it is clear from County's testimony that he was personally involved.  Thus, the objections are OVERRULED.

9.   Plaintiff objects to Exhibit N of the Knapp Declaration in support of the Chalk, County, Gray, and Lumb Motions.  This exhibit is a Declaration by Jeffrey V. Smith, M.D., about kidney dialysis, the way medical decisions about prisoners are made, and the capacity of the County Hospital for kidney dialysis.  Plaintiff objects on the grounds of lack of foundation/personal knowledge.  Smith does not state that he has personal knowledge of the facts in his declaration.  Thus, the objection is SUSTAINED.  However, Smith does state that he is the Executive Director of the Contra Costa County Regional Medical Center (aka County Hospital), which is a basis for personal knowledge of his assertion that the County Hospital does not have dialysis facilities.  *See* Smith Decl. at ¶ 5.  Thus, the objection is OVERRULED with respect to that statement.

10.   Plaintiff objects to Exhibit B of the Knapp Declaration in support of the Motions by Contra Costa County and the Contra Costa County Sheriff's Department.  This exhibit is an excerpt from the deposition of Kenneth Brooks, M.D., in which he is apparently reading from a document, clearly authored by someone else and which he testifies that he has never seen. Plaintiff objects on the grounds of lack of foundation/personal knowledge, and hearsay.  It is unclear to the court what the document is that Brooks is reading from, who authored it,

18

**United States District Court**
For the Northern District of California

whether the document is properly characterized as a business record or whether it was prepared simply in anticipation of litigation or for some other purpose. The objections are SUSTAINED.

11.  Plaintiff objects to Exhibit C of the Knapp Declaration in support of the Motions by Contra Costa County and the Contra Costa County Sheriff's Department.  This exhibit is an excerpt from the deposition of Jeffrey Barnhart, M.D., in which he discusses provision of dialysis treatment for prisoners.  Plaintiff elicited the objectionable testimony from the witness and now objects on the grounds of lack of foundation/personal knowledge. The foundation objection has been waived, since no such objection was interposed at the time Plaintiff created this record.  Moreover, given his expertise, there is no need for personal knowledge in connection with medical opinions rendered by Dr. Barnhart.  Thus, the objections are OVERRULED.

12.  Plaintiff objects to Exhibit E of the Knapp declaration in support of the Motions by Contra Costa County and the Contra Costa County Sheriff's Department.  This exhibit is an excerpt from the deposition of Vicki Yamamoto.  Plaintiff objects on the grounds of lack of foundation/personal knowledge, and hearsay.  Plaintiff does not identify any offensive testimony, he simply recites a string of objections to nine pages of testimony which he is responsible for placing in the record.  The Court is reticent to countenance the kind of indolence which shifts Plaintiff's duty to specifically identify his objections to the Court.   It is enough that the parties seek the Court's intervention in order to resolve the myriad issues which they are unable to resolve without also being required to figure out specifically what those issues are.  Given the absence of information and/or argument which demonstrates that any specific portion(s) of this declaration transgress these evidentiary rules, the objections are OVERRULED.  Further, Ms. Yamamoto's testimony related to her role as the health care manager for California State Prison Corcoran and her familiarity with Plaintiff's case.  Her testimony establishes the basis of her personal knowledge, as is allowed under Rule 602. Thus, these objections are OVERRULED.

13.  Plaintiff objects to Exhibit F of the Knapp declaration in support of the Motions by Contra

19

**United States District Court**
For the Northern District of California

Costa County and the Contra Costa County Sheriff's Department.  This is an exhibit from the deposition of Vicki Yamamoto, which is titled "Offender Based Information System", ostensibly relating to Plaintiff's custody and release history.  Plaintiff objects on the ground that it lacks foundation, citing Rule 901(a) (improper authentication), and on hearsay grounds.   The declaration of Knapp that the document is a true and correct copy of a deposition exhibit of Vicki Yamamoto is wholly inadequate to either authenticate the document or to demonstrate a foundation for its admissibility.  Both objections are SUSTAINED.

14.   Plaintiff objects to Exhibit G of the Knapp declaration in support of the Motions by Contra Costa County and the Contra Costa County Sheriff's Department.  This is an 19 page excerpt from the deposition of George Kaysen, M.D., in which he discusses his opinion that there was no deliberate indifference to Plaintiff's medical needs.  Plaintiff objects on the grounds of lack of foundation/personal knowledge, and hearsay.  Again, Plaintiff makes no attempt to specifically identify the testimony to which he objects.  Moreover,  Plaintiff created the extensive record to which he now objects and made no objections to the testimony which he elicited from the witness.   The foundation objection has been waived and, with respect to the personal knowledge and hearsay objections, the Court is not inclined to scour the exhibit in hopes of correctly identifying the testimony which Plaintiff now finds offensive.  Given the absence of information and/or argument which demonstrates that  any specific portion(s) of this declaration transgress these evidentiary rules, the objections are OVERRULED. Further, Dr. Kaysen testified  that he reviewed particular records and has particular qualifications that form a basis for his opinion. Clearly, medical doctors are allowed to review records in order to formulate medical diagnoses and opinions.  This does not transgress the hearsay rule.  If there is some other purpose to Plaintiff's objection, it is not apparent.   Thus, the objections are OVERRULED.

15.   Plaintiff objects to Exhibit L of the Knapp declaration in support of the Motions by Contra Costa County and the Contra Costa County Sheriff's Department.  This is an excerpt from the deposition of Thomas Chalk, in which he testified regarding his understanding of Plaintiff's

**United States District Court**
For the Northern District of California

need for dialysis on March 15, 2001.  Plaintiff objects on the grounds of lack of personal

knowledge and on hearsay grounds.  Again, Plaintiff does not identify any particular

statement.  Further, Chalk's testimony establishes that he has personal knowledge, as is

allowed under Rule 602, and Plaintiff failed to object during the deposition.  Thus, the

objections are OVERRULED.

16.   Plaintiff objects to Exhibit M of the Knapp declaration in support of the Motions by Contra

Costa County and the Contra Costa County Sheriff's Department.  This is an 13 page excerpt

from the deposition of Donald Calvo, M.D., in which he reads from what appears to be,

Plaintiff's medical chart.  Plaintiff objects on the grounds of lack of foundation/personal

knowledge, and on hearsay grounds.  Plaintiff made a foundation objection during the

deposition.  The objection is SUSTAINED.

17.   Plaintiff objects to Exhibit N of the Knapp declaration in support of the Motions by Contra

Costa County and the Contra Costa County Sheriff's Department.  This is an excerpt from the

deposition of Miles Kramer, in which he discusses the prison system's provision of dialysis

for inmates.  Plaintiff objects on the grounds of lack of foundation/personal knowledge, and

on hearsay grounds.  Again, Plaintiff created the record he now finds offensive, made no

objections during the deposition to the testimony and identifies no specific statement to

which he objects.  Given the substance of the testimony, it is not apparent to the Court what

Plaintiff's personal knowledge and hearsay objections are.  Given the absence of information

and/or argument which demonstrates that  any specific portion(s) of this declaration

transgress these evidentiary rules, the objections are OVERRULED.

18.   Plaintiff objects to Paragraph 18 of the Declaration of Dr. Lewis Haut in support of CDCR's

Motion for Summary Judgment.   It appears that Plaintiff only objects to the following

sentence from paragraph 18: "I also noted that Plaintiff did not follow this medical advice

because he regularly consumed inappropriate food items while incarcerated."  Plaintiff

objects on the grounds of lack of foundation/personal knowledge, and on hearsay grounds.

The hearsay objection is SUSTAINED to the extent that Haut's testimony from the reports is

being preferred for the truth of what it asserts.  However, it is OVERRULED to the extent it

**United States District Court**
For the Northern District of California

1   is being offered as evidence upon which Haut relied in formulating the medical opinion

2   which he ultimately proffers in paragraph 20.  Further, the lack of foundation objection is

3   OVERRULED.

4   19.    Plaintiff objects to Paragraph 19 of the Declaration of Dr. Lewis Haut in support of CDCR's

5   Motion for Summary Judgment.  Plaintiff objects to the following sentences from this

6   paragraph: " It is conceivable that the handcuffing of a hemodialysis patient with an access

7   graft in his left forearm may conceivably contribute to the clotting of the graft.  However,

8   because clotting may occur spontaneously, I do not believe that there is sufficient evidence

9   that handcuffing, in whatever manner he may have been handcuffed, caused the clotting of

10   Plaintiff's graft."  Plaintiff objects on the grounds of lack of foundation/personal knowledge,

11   hearsay, and on the ground that it is an improper legal conclusion (citing Rule 701).  There is

12   no apparent basis for the hearsay objection.  The foundation objection is also without merit,

13   given the extensive education, knowledge and training in nephrology set forth in Haut's

14   declaration.  He has clearly presented sufficient foundation to render an opinion concerning

15   the medical likelihood that handcuffing could contribute to or cause graft clotting.

16   Moreover, there is no requirement that a medical doctor has personal knowledge of an event

17   in order to render medical opinions in court.  Therefore, the personal knowledge objection is

18   also OVERRULED.  Finally, although it does not appear to the Court that  Dr. Haut is

19   intending to render a legal opinion (as opposed to asserting there is insufficient evidence for

20   him to conclude as a medical fact), to the extent his opinion is being offered as a legal

21   conclusion, Plaintiff's objection is SUSTAINED.

22   20.    Plaintiff objects to Exhibit B of the Haut Declaration.  This exhibit is a report by Dr. Haut,

23   dated November 13, 2006,  in which he reviews the history of Plaintiff's medical care while

24   incarcerated, and concludes that "most of the problems are of his own choice," and that

25   CDCR's track record was good.  Plaintiff objects on the grounds of lack foundation/personal

26   knowledge, and hearsay.  Most of the report is hearsay in the sense that it is Dr. Haut's

27   recitation of the statements of Plaintiff's various doctors and nurses being offered, ostensibly

28   for the truth of what they assert.  Defendants have not laid a foundation for the admission of

United States District Court
For the Northern District of California

1    such hearsay.  The objections are SUSTAINED.

2    21.   Plaintiff objects to Paragraph 5 of the Declaration of N. Grannis to the extent that it

3          concludes: " Other than those inmate appeals that appear on the computerized printout, there

4          are no other inmate appeals that were filed by Plaintiff and accepted for review by the Inmate

5          Appeals Branch from August 1997 to December 15, 2005."  Plaintiff objects to this evidence

6          on foundation and hearsay grounds, arguing that Grannis fails to establish that a record of

7          inmate appeals is recorded at or near the time of the appeal as required by F.R.E. 803(6) and

8          that Grannis fails to establish that appeals which were filed and rejected for review are

9          recorded in the computerized database.  Plaintiff's first objection is persuasive, given the

10         substance of paragraph 2 wherein Grannis declares in pertinent part: "When an inmate appeal

11         is received by the Inmate Appeals Branch and is accepted for review, it will be given an

12         appeal number and logged into the system."  This language suggests that the inmate appeals

13         are recorded at or near the time the appeal is received.  However, the language could also be

14         construed that the appeals which are received are not recorded until they are accepted for

15         review and, given the absence of evidence of the temporal proximity between the

16         presentation and acceptance, Plaintiff's objection is SUSTAINED.  Plaintiff is also correct

17         that since Grannis has not provided evidence that appeals which were filed and rejected for

18         review are recorded in the computerized database, Grannis has failed to lay a proper

19         foundation for any conclusion that there were no other inmate appeals filed by Plaintiff.  To

20         the extent paragraph 5 is being offered for that implicit suggestion, Plaintiff's objection is

21         SUSTAINED.

22   22.   Plaintiff objects to the Declaration of Lt. Eric H. Messick in its entirety.  Messick declares

23         that he is an employee at San Quentin, and provides information regarding the escort

24         procedures and mechanical restraint procedures at San Quentin.  Plaintiff makes a relevance

25         objection that the Messick Declaration does not demonstrate that Plaintiff was not

26         handcuffed behind his back while in CDCR custody and that, at best, it simply confirms that

27         Plaintiff should not have been handcuffed behind his back.   At issue in this case is whether

28         the use of handcuffs on Plaintiff constituted excessive force given his medical condition, and

23

1    Messick's declaration is probative of that issue.  Thus, the objection is OVERRULED.

2    23.    Plaintiff objects to Exhibit D of the Declaration of Trace Maiorino.  This exhibit is an eight

3           page excerpt from the deposition of Dr. Lewis Haut, in which he opines that Plaintiff

4           received very good care while in custody.  The entire excerpt is from the cross-examination

5           of Dr. Haut by Plaintiff's counsel, to which no objection was made at the time.   Plaintiff now

6           objects on the grounds of lack of foundation/personal knowledge, and hearsay but provides

7           no guidance to the Court identifying the specific testimony he finds objectionable.  As a

8           medical expert, Dr. Haut is entitled to review documents for the purpose of informing his

9           medical opinion and his testimony is clearly premised upon his review of Plaintiff's records.

10          The objections are OVERRULED.

11   24.    Plaintiff objects to Exhibit G of the Maiorino Declaration.  This exhibit is an 34 page excerpt

12          from the deposition of George Kaysen, M.D., in which he renders an opinion that there was

13          no deliberate indifference to Plaintiff's medical needs.  Plaintiff objects on the grounds of

14          lack of foundation/personal knowledge, and hearsay.  These objections suffer from the same

15          deficiencies of Plaintiff's previous objections.   Plaintiff does not identify specifically what

16          he is objecting to, but, ostensibly expects the Court to scrutinize 34 pages of testimony which

17          he placed in the record for some conceivable bases of the objections.  Given the absence of

18          information and/or argument which demonstrates that  any specific portion(s) of this

19          deposition transgress these evidentiary rules, the objections are OVERRULED. Moreover

20          Dr. Kaysen's testimony is clearly premised in part upon his review of Plaintiff's medical

21          records and his general knowledge of dialysis treatment.  These objections are

22          OVERRULED.

23   25.    Plaintiff objects to Exhibit H of the Maiorino Declaration.  This exhibit is an excerpt from

24          the deposition of George Wolfe, M.D., in which he discusses Plaintiff's treatment based upon

25          his review of the records and the depositions of other witnesses.  The portion of the

26          deposition excerpted is from the cross-examination of Dr. Wolfe by Plaintiff's counsel.

27          Plaintiff objects on the grounds of lack of foundation/personal knowledge, and hearsay.  He

28          interposed no objections to the testimony during the time he elicited it from the witness and

                                              24

he fails to identify what portions of the 34 pages of testimony these objections refer to.  For the reasons articulated above, these objections are OVERRULED.

26.   Plaintiff objects to Exhibit I of the Maiorino Declaration.  This exhibit is a memorandum from the State of California Department of Corrections to Wardens and Health Care Managers regarding transfer of health information policies and procedures.  Plaintiff objects on the grounds of lack of foundation/personal knowledge, hearsay, and relevance.  Consistent with his practice, Plaintiff offers no explanation or argument whatsoever for the string of objections he is making to nearly every piece of evidence submitted by Defendants, including evidence of his own making.  Given the nature of this evidence, Plaintiff's objections are unclear to the Court.  Without some direction from Plaintiff, the Court would simply be guessing in its attempt to identify and resolve what Plaintiff's objections may be.  Given the absence of information and/or argument which demonstrates that  this exhibit transgresses these evidentiary rules, the objections are OVERRULED.

27.   Plaintiff objects to Exhibit B of the Declaration of David Walker.  This exhibit is an 11 page excerpt from the deposition of Fatmata Longstreth.  Again,  Plaintiff "string"objects on the grounds of lack of foundation/personal knowledge, and hearsay, but fails to identify any particular statement or testimony implicated.  Given the absence of information and/or argument which demonstrates that  any specific portion(s) of this deposition transgress these evidentiary rules, the objections are OVERRULED. Moreover, it is clear from the substance of the testimony that  Longstreth's knowledge of the events is based on the fact that she was present. *See* Rule 602.  Thus, the objections are OVERRULED.

28.   Plaintiff objects to Exhibit C of the Walker Declaration.  This exhibit is an excerpt from the deposition of Kenneth Brooks, M.D., in which he was examined by Plaintiff's counsel regarding his involvement in Plaintiff's medical care.  Plaintiff objects on the grounds of lack of  foundation/personal knowledge, and hearsay.  For the reasons articulated above, the objections are OVERRULED.

29.   Plaintiff objects to Exhibit D of the Walker Declaration.  This exhibit is an 66 page excerpt from the deposition of James Rael, M.D., in which he was examined by Plaintiff's counsel

**United States District Court**
For the Northern District of California

regarding his job duties, asked about entries in Plaintiff's medical chart, and asked about how the prison addressed Plaintiff's medical needs.  Plaintiff objects on the grounds of lack of foundation/personal knowledge, and hearsay, but provides no guidance as to what testimony in this 66 page excerpt his objections relate to.  Given the absence of information and/or argument which demonstrates that  any specific portion(s) of this deposition transgress these evidentiary rules, the objections are OVERRULED.

30.     Plaintiff objects to Exhibit G of the Walker Declaration.  This exhibit is the Declaration of Fred Gray.  Plaintiff has previously interposed these objections to the same evidence. (see objection No. 1).

31.     Plaintiff objects to Exhibit G of the Walker Declaration.  This exhibit is the Declaration of Jeffrey V. Smith.  Plaintiff has previously interposed these objections to the same evidence. (see objection No. 9).

**B.      Defendants' Objections to Plaintiff's Evidence[7]**

1.      Defendants object to Paragraphs 21-39 of Calloway's Declaration on hearsay grounds.  These paragraphs detail dates on which Plaintiff alleges he received inadequate dialysis treatment.  It is not apparent to the Court that this testimony constitutes hearsay and, other than interposing the objection, Defendants have proffered no specific information or argument which demonstrates that it is hearsay.  Consequently, the hearsay objection is OVERRULED.   Defendants also object that "[a] party may not use a declaration to avoid summary judgment by contradicting the same facts that he testified to at deposition."  *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  To disallow the declaration under the *Kennedy* rule, this Court must make a determination that the declaration is a "sham," in that it flatly contradicts earlier testimony in an attempt to create an issue of material fact and avoid summary judgment.  Defendants offer many instances from Plaintiff's deposition testimony where he was unable to remember dates, but the *Kennedy*

_____

[7]Defendants submitted two sets of objections to Plaintiff's evidence: one from the County Defendants and one from CDCR.  This Order combines the two and does not distinguish between objections made by the County and those made by CDCR.

**United States District Court**
For the Northern District of California

court was clear that discrepancies due to honest mistake do not constitute "sham" testimony. The Court declines to exclude the declaration as a sham.  Thus, the objection is OVERRULED.

2.   Defendants object to a portion of Paragraph 3 of Calloway's Declaration, in which he states that "Both the fistula and the graft were visible to anyone who looked at my arm or wrist." Defendants object based on lack of personal knowledge and speculation.  The Court agrees that the statement is speculative; the objection is SUSTAINED.

3.   Defendants object to a portion of Paragraph 5 of Calloway's Declaration, in which he states that "a doctor at the hospital instructed that I should not be handcuffed behind my back because this was likely the cause of the blockage in my dialysis access."  Defendants object on hearsay grounds.  Given the substance of Plaintiff's comments in this paragraph, it does not appear that Plaintiff is offering this statement for the truth of what it asserts, rather it is offered to explain and to put his subsequent conduct into context, i.e. advising the Defendants of the handcuffing dangers.  The objection is OVERRULED.

4.   Defendants object to a portion of Paragraph 6 of Calloway's Declaration, in which he states that "Officers in the Administrative Segregation Unit told me that they had no reason to use waist chains on me, instead of behind the back handcuffing, since they had not been advised of my forearm dialysis access."  Defendants object on hearsay grounds.  This statement is hearsay, however, given the issues implicated in this trial, the content of Plaintiff's statement appears to fall within the exception provided by Rule 801(d)(2), Admission by Party Opponent. The objection is OVERRULED.

5.   Defendants object to a portion of Paragraph 7 of Calloway's Declaration, in which he states that "As a result, both deputies were aware that I obtained dialysis through that access near my wrist."  Defendants object on the ground that Plaintiff lacks personal knowledge and the statement is speculative and conclusory.  The Court agrees that the statement is speculative; the objection is SUSTAINED.

6.   Defendants object to two portions of Paragraph 8 of Calloway's Declaration, in which he states (1) "The sergeant told me that she was told by the deputy at R&R that I would get

**United States District Court**
For the Northern District of California

1  dialysis in the county," and (2) "He told me that I would get dialysis when I got to the

2  County."  Defendants object on hearsay grounds.  These are hearsay statements which appear

3  to be excepted from exclusion as Admissions by Party Opponents, given the issues currently

4  implicated in this case.  Defendant CDCR's assertion that the entire paragraph is hearsay is

5  without merit.  Much of the paragraph is Plaintiff's recounting of his own activities on

6  March 14.  Thus, the objections are OVERRULED.

7.  Defendants object to a portion of Paragraph 9 of Calloway's Declaration, in which he states

8       "The judge ordered that I be taken to the County Hospital for dialysis right away, and that I

9       was to stay in the County."  Defendants object on hearsay grounds.  The Court concurs.  The

10      objection is SUSTAINED.

8.  Defendants object to a portion of Paragraph 15 of Calloway's Declaration, in which he states

12      that the officers hit him while handcuffing him after the tasing incident.  Defendants argue

13      that this should be excluded as "sham" testimony under *Kennedy, supra*.  They point to

14      excerpts of Calloway's deposition testimony where he discussed the incident, and did not

15      testify that the officers hit him.  However, he did testify that they were "rough" with him and

16      pulled his arms back.  The deposition testimony and the declaration are not directly

17      contradictory, and thus the Court does not find the declaration to be sham testimony.   Thus,

18      the objection is OVERRULED.

9.  Defendants object to a portion of Paragraph 17 of Calloway's Declaration, in which he states

20      that the nurse left.  Defendants argue that this should be excluded as sham testimony under

21      *Kennedy, supra*, because in Calloway's deposition, he testified that he did not need the nurse

22      to help him.  Calloway's full testimony at the deposition was that he felt the nurse was

23      ignoring his complaints, so he told her he didn't need her help.  *See* Calloway Depo. 7/7/06 at

24      133.  There is no tension between Calloway's deposition testimony and his declaration.  The

25      declaration does not address the reason the nurse left, only the fact that she left.  Defendants'

26      concern is not implicated.  The objection is OVERRULED.

10.  Defendants object to a portion of Paragraph 19 of Calloway's Declaration, in which he states

28       that "The medical staff told me that no dialysis was available for me, and that I had to wait

28

United States District Court
For the Northern District of California

for my next regularly scheduled appointment, which was the next day.  I then asked a nurse for dialysis and was told to wait until the next day.  Then I went to the emergency section at the San Quentin medical clinic and asked to see a doctor.  I told the doctor that I had not been getting dialysis, but he said to wait until the next day."  Defendants object on hearsay grounds. Whether the evidence is hearsay depends on the purpose for which it is being offered.  To the extent Plaintiff is offering the evidence to explain his conduct in asking the nurse and later the San Quentin emergency section doctor for dialysis, the evidence is not hearsay and the objection is OVERRULED.  To the extent the evidence is offered for the truth and if the Party Admission exception is unavailable (which is not clear), the objection is SUSTAINED.

11.     Defendants object to a portion of Paragraph 20 of Calloway's Declaration, in which he states that "the fistula in my arm was damaged by the incident with the County deputies and no longer worked."  Defendants argue that this constitutes improper lay opinion under Federal Rule of Evidence 701.  The Court is inclined to agree – this is a medical conclusion.  Thus, the objection is SUSTAINED.

12.     Defendants object to a portion of Paragraph 22 of Calloway's Declaration, in which he states that "The injury to my graft was caused by the repeated handcuffing of my arms behind my back."  Defendants argue that this constitutes improper lay opinion under Federal Rule of Evidence 701.  The Court agrees; the objection is SUSTAINED.

13.     Defendants object to Paragraph 27 of Calloway's Declaration, in which he states that "On September 26, 2001, I was scheduled for dialysis treatment while at a prison in Corcoran, California, but I did not receive it because I was transferred to the County jail the day before.  The County did not provide me with dialysis treatment, and I did not get it until I was admitted to Novato Community Hospital on September 28, 2001."  Defendants argue that this paragraph is irrelevant and any probative value is outweighed by the risk of unfair prejudice.  The Court disagrees.  The statement is probative of whether Defendants were deliberately indifferent to Plaintiff's medical needs, and it is not unduly prejudicial.  Thus, the objection is OVERRULED.

**United States District Court**
For the Northern District of California

14. Defendants object on relevance grounds to Paragraphs 28-32 of Calloway's Declaration, in which he discusses alleged incidents of indifference to his medical needs. For the reasons discussed above, the objection is OVERRULED. Defendants also object to a portion of Paragraph 30 of Calloway's Declaration, in which he states that "I asked that an arm access be inserted because the chest catheter is not permanent and is more vulnerable than an arm access, but was refused. Later on February 1, 2002, I agreed to have a new chest catheter inserted, and was scheduled to have the surgery on February 2, 2002, but no transportation arrived to take me to the appointment, so the procedure could not be done." Defendants object on the ground of lack of personal knowledge. The Court disagrees. Presumably, the objection is to the first and not second sentence implicated. To the extent it is to the latter, it is OVERRULED as the Plaintiff is certainly in a position to know whether transportation ever arrived to take him to the appointment. Moreover, with regard to the former, the statement does not appear to proffer a personal medical opinion so much as it simply recounts the request which Plaintiff made and his reason for making the request ( i.e. requesting arm access because he believed or understood the chest catheter to be more vulnerable). Thus, the objection is OVERRULED.

15. Defendants object to Paragraphs 33-40 of Calloway's Declaration, in which he discusses missed dialysis treatments. Defendants argue that this testimony is irrelevant and that any probative value is outweighed by the risk of unfair prejudice. Again, the Court disagrees – the evidence is highly relevant to Plaintiff's claim of deliberate indifference to his medical needs, and it is not unduly prejudicial. The objection is OVERRULED. Defendants make the same objection to Paragraphs 41-46 of Calloway's Declaration, in which he discusses inadequate hygiene and laundry, and alleged injuries resulting from missed dialysis. For the same reasons, the objection is OVERRULED.

16. Defendants object to a portion of Paragraph 42 of Calloway's Declaration, in which he states that "While I was incarcerated at the County Jail, I was allowed to take showers only every other day." Defendants argue that this is irrelevant, because the adequacy of hygiene was not identified as an issue in the operative Complaint. This is true, but the adequacy of hygiene is

probative of whether Defendants were deliberately indifferent to Plaintiff's medical needs, which is put in issue by the Complaint.  Thus, the objection is OVERRULED.

17.    Defendants object to a portion of Paragraph 44 of Calloway's Declaration, in which he states that "While I was incarcerated at the County Jail, I was provided only two shirts per week, with one laundry change per week.  As a result, I was not able to change into a clean shirt every day."  Defendants make the same objection as above, and it is OVERRULED for the same reasons.

18.    Defendants object to a portion of Paragraph 45 of Calloway's Declaration, in which he states that "After a catheter was placed in my chest to provide dialysis access in July 2001, the dressings surrounding the catheter were not changed by medical staff daily or even after each shower.  In addition, I was not provided with medication to disinfect the catheter site." Defendants make the same objection as above, and it is OVERRULED for the same reasons.

19.    Defendants object to Paragraph 46 of Calloway's Declaration, in which he states that "When I did not receive my scheduled dialysis treatments in 2001 and 2002, I became very sick.  I felt nauseated, experienced swelling of my face, and had difficulty breathing and sleeping.  I developed diarrhea, found it very difficult to move, and would experience chills and uncontrollable shaking.  Over time, I would become disoriented and delirious."  Defendants argue that Plaintiff lacks personal knowledge and it is improper lay opinion.  The Court disagrees.  Plaintiff certainly has knowledge of his own physical symptoms, and through this declaration he is not seeking to offer a medical opinion.  He is testifying to the physical and mental symptoms which he experienced in close temporal proximity to missed dialysis appointments.   Thus, the objection is OVERRULED.  Defendants also object to this Paragraph on the ground that Plaintiff should not be permitted to proffer contradicting evidence to avoid summary judgment, citing *Kennedy, supra*.  According to Defendants, Plaintiff admitted at his deposition that he did not miss dialysis treatments at San Quentin after March 2001.  This is not directly contradictory to Paragraph 46, which makes no reference to where Plaintiff missed dialysis treatments.  Thus, the objection is OVERRULED.

**United States District Court**
For the Northern District of California

20. Defendants object to a portion of Paragraph 3 of the Declaration of Michael J. Blumenkrantz, in which he states that "despite their knowledge of his needs and of the life-threatening consequences that would result to Mr. Calloway from their failure to address those needs." Defendants object on the ground of lack of personal knowledge and based on Rules 702 and 703 (improper expert testimony). The Court agrees that Dr. Blumenkrantz lacks personal knowledge of what Defendants knew about Plaintiff's needs.  The objection is SUSTAINED.

21. Defendants object to a portion of Paragraph 4 of the Blumenkrantz Declaration, in which he states that "The repeated need to hospitalize Mr. Calloway when he presented with symptoms resulting from severe hyperkalemia (excessive potassium in his blood) and/or infection reveals that the correctional health care providers failed to ensure that Mr. Calloway had adequate and timely dialysis as well as appropriate measures to avoid infection."  Defendants object on the ground of lack of personal knowledge, speculation, and improper expert testimony.  The Court disagrees.  The basis for Blumenkrantz's personal knowledge is his medical expertise and his review of Plaintiff's medical records, and he is qualified to give an opinion as to the cause of Plaintiff's hospitalizations.  The objections are OVERRULED.

22. Defendants object to Paragraphs 6-8 of the Blumenkrantz Declaration.  Paragraph 6 states: "Regarding Mr. Calloway's dialysis access, I believe that in 2001 Mr. Calloway suffered from a clotted graft on multiple occasions because Mr. Calloway was handcuffed behind his back, contrary to the instructions of a physician who treated Mr. Calloway.  The handcuffing of Mr. Calloway contributed to occluding the graft in his left forearm, which had serious adverse consequences because, if the graft had continued to function, Mr. Calloway would not have needed the temporary chest catheter, which damaged his veins, made him susceptible to life-threatening sepsis (a serious infection), and caused him to almost die from hyperkalemia due to inadequate or missed dialysis treatment."  Paragraph 7 states: "Regarding the provision of timely an adequate dialysis treatment to Mr. Calloway, the medical records show that Mr. Calloway missed his scheduled dialysis on numerous occasions in 2001 and 2002, which required that he be hospitalized in several instances."

32

United States District Court
For the Northern District of California

Paragraph 8 states: "In my view, during the 2001-2002 period, Mr. Calloway had a serious medical need and suffered serious harm as a result of the failure of CDCR and the County to provide scheduled dialysis treatment when Mr. Calloway was transferred by CDCR to the County." Defendants object on the grounds of lack of personal knowledge, speculation, and improper expert opinion. The objections are OVERRULED. This testimony presents proper opinions of a medical expert who has reviewed Plaintiff's records.

23.   Defendants also object to a portion of Paragraph 4, a portion of Paragraph 7, Paragraph 8, and a portion of Paragraph 9 of the Blumenkrantz Declaration on the ground that they are irrelevant or unduly prejudicial, because they refer to events in 2002 and "[a]s to CDCR, Plaintiff makes no allegations against it that allegedly occurred in 2002." The Court disagrees – Plaintiff's ADA and RA claims against CDCR are based in part on events that occurred in 2002. Thus, the objection is OVERRULED.

24.   Defendants object to a portion of Paragraph 9 of the Blumenkrantz Declaration, in which he states that "County Jail leadership, medical staff, and custody staff were indifferent to Mr. Calloway's serious medical needs." Defendants object on the ground of lack of personal knowledge and improper expert testimony. Dr. Blumenkrantz is a nephrologist and his Declaration reveals that he reviewed Plaintiff's medical records. He is qualified to give an opinion as to the adequacy of Plaintiff's medical care. However, this statement is an opinion on an ultimate legal issue in the case, which invades the province of the jury. Thus, the objection is SUSTAINED.

25.   Defendants object to a portion of Paragraph 9 of the Blumenkrantz Declaration, in which he states that "despite their knowledge that he could suffer serious health effects from the failure to have dialysis." Defendants object on the ground of lack of personal knowledge and improper expert testimony. Again, the Court agrees that the declarant lacks personal knowledge of Defendants' state of mind or level of knowledge. The objection is SUSTAINED.

26.   Defendants object to a portion of Paragraph 9 of the Blumenkrantz Declaration, in which he states that "It is apparent that the leadership of the County Jail failed to train and supervise its

staff to assure that a dialysis patient such as Mr. Calloway received timely treatment." Defendants object on the ground of lack of personal knowledge and improper expert testimony.  This statement invades the province of the jury, and the objection is SUSTAINED.

27.    Defendants object to Paragraph 10 of the Blumenkrantz Declaration, which states that "Similarly, I think that CDCR could have helped to avoid many of the problems resulting from the County's inability to provide timely dialysis treatment for Mr. Calloway by taking such simple steps as ensuring that the County had timely and adequate information about Mr. Calloway's serious medical needs by telephoning the County Jail in advance of Mr. Calloway's transfer so that arrangements for dialysis could have been made."  Defendants object on the ground of lack of personal knowledge, speculation, and improper expert testimony, as well as relevance.  The Court agrees that this statement is speculative and outside the bounds of what Dr. Blumenkrantz is qualified to testify about as a medical expert. The statement goes more to proper prison administration, which is not within Dr. Blumenkrantz's expertise.  Thus, the objections are SUSTAINED.

28.    Defendants object to Paragraph 11 of the Blumenkrantz Declaration, which states: "Regarding the need to avoid infection that could create a life-threatening condition because of Mr. Calloway's impaired immunity, I understand that Mr. Calloway was not provided the ability to shower daily, to change into a clean, laundered shirt at least daily, and to appropriately disinfect the site of his chest catheter so that he could avoid the risk of serious infection associated with the chest catheter that was used for dialysis access during part of 2001 and 2002.  I understand that both CDCR and the County failed to provide such simple accommodation as these measures to enable Mr. Calloway to reduce the likelihood of infection."  Defendants object on relevance grounds, because the hygiene issue was not raised in the operative Complaint.  As discussed earlier, this is probative of whether Defendants were deliberately indifferent to Plaintiff's medical needs, which was raised in the Complaint.  Thus, the objection is OVERRULED.  Defendants also object on the ground that the declarant lacks personal knowledge.  This objection is also OVERRULED.  Dr.

**United States District Court**
For the Northern District of California

1
2
3
4
5

Blumenkrantz is simply reciting his "understandings" (presumably based upon reading the medical and other reports), which inform his medical opinion regarding avoiding infection that could create a life-threatening condition. This evidence is not presented for the truth but to understand the information which he considered in his medical assessment culminating in the opinion he subsequently recites.

6
7
8
9
10
11
12
13
14
15

29.   Defendants object to a portion of Paragraph 12 of the Blumenkrantz Declaration, in which he states "I believe that Mr. Calloway was fluid overloaded and hypertensive for an extended period due to inadequate dialysis, so that he now has a permanent injury to his heart called cardiomyopathy, which is the decreased ability of the heart to pump blood." Defendants argue that this is unreliable and improper expert opinion, because at his deposition, Dr. Blumenkrantz stated that the definitive test for cardiomyopathy would be a cardiogram, which he did not review. *See* Maiorino Decl. Ex. E. However, Dr. Blumenkrantz testified that he reviewed other tests performed on Plaintiff – the fact that the "definitive" test was not performed does not necessarily distract from the reliability of Dr. Blumenkrantz's medical opinion. Cross examination is the proper response. Thus, this objection is OVERRULED.

16
17
18
19
20
21

30.   Defendants object to a portion of Paragraph 13 of the Blumenkrantz Declaration, in which he states "In addition, I believe that these same authorities failed to provide reasonable accommodations for Mr. Calloway's disability arising from his medical condition." Defendants object on the ground that this is improper expert testimony. This is an opinion on an ultimate issue in the case, and thus invades the province of the jury. The objection is SUSTAINED.

22
23
24
25

31.   Defendants object to a portion of Paragraph 3 of the Declaration of Robert B. Greifinger, M.D., which is identical to the objected-to portion of Paragraph 3 of the Blumenkrantz Declaration, on the same grounds of lack of personal knowledge and improper expert testimony (see objection No. 20). For the same reasons, the objection is SUSTAINED.

26
27
28

32.   Defendants object to a portion of Paragraph 3 and to Paragraphs 4 and 5 of the Greifinger declaration. The portion of Paragraph 3 is the same as objected to above. Paragraph 4 states that "Between January 2001 and April 2002, Mr. Calloway was hospitalized on at least seven

occasions, several of which resulted from Mr. Calloway's delayed access to dialysis.  In my view, such delays should not occur in a correctional environment.  The repeated need to hospitalize Mr. Calloway when he presented symptoms resulting from severe hyperkalemia (excessive potassium in his blood) and/or infection reveals that the correctional health care providers failed to ensure that Mr. Calloway had adequate and timely dialysis as well as appropriate measures to avoid infection."  Paragraph 5 states that "Regarding Mr. Calloway's dialysis access, I believe that in 2001 Mr. Calloway suffered from a clogged graft on multiple occasions because of poor communication between CDCR medical staff and CDCR custody staff regarding how Mr. Calloway was to be restrained.  Mr. Calloway could have been restrained by handcuffing him with his hands in front of him or by the use of a waist chain to which his wrists could be secured.  The repeated handcuffing of Mr. Calloway behind his back contributed to occluding the graft in his left forearm."  Defendants object on the ground of  lack of personal knowledge, speculation, and improper expert testimony.  The objection is OVERRULED with respect to Paragraph 4: that statement is based on Dr. Greifinger's medical expertise and on his review of Plaintiff's records, and it is a valid expert opinion.  The objection is SUSTAINED in part with respect to Paragraph 5: Dr. Griefinger's declaration lays no foundation enabling him to offer an expert opinion on methods of restraining prisoners, and he lays no foundation for his opinion regarding the cause of Plaintiff's clotted graft.

33.     Defendants object to Paragraph 6 and a portion of Paragraph 7 of the Greifinger Declaration.  Paragraph 6 states that: "Regarding the provision of timely and adequate dialysis treatment to Mr. Calloway, the medical records show that Mr. Calloway missed his scheduled dialysis on numerous occasions in 2001 and 2002, which required that he be hospitalized in several instances."  Paragraph 7 states that: "In my view, during the 2001-2002 period, Mr. Calloway had a serious medical need and suffered serious harm as a result of a failure of maintaining continuity and coordination of care by CDCR and the County.  This failure appeared in several instances where Mr. Calloway was transferred by CDCR to the County, but no arrangement was made to ensure that Mr. Calloway would receive his required dialysis

1    treatment while in the custody of the County."  Defendants object on the grounds of lack of

2    personal knowledge, speculation, and improper expert testimony.  Dr. Greifinger is not a

3    nephrologist, but he is still qualified to render medical opinions on the harm caused to

4    Plaintiff by missed dialysis.  Further, his opinion is based on his review of the records, his

5    medical knowledge, and his experience as a consultant for correctional institution health care

6    systems.  Thus, the objection is OVERRULED.

7    34.    Defendants object to a portion of Paragraph 8 of the Greifinger Declaration, which is

8           identical to the objected-to portion of Paragraph 9 of the Blumenkrantz Declaration, on the

9           same grounds of lack of personal knowledge and improper expert testimony (see objection

10          No. 24).

11   35.    Defendants object to a portion of Paragraph 8 of the Greifinger Declaration, which is

12          identical to the objected-to portion of Paragraph 9 of the Blumenkrantz Declaration, on the

13          same grounds of lack of personal knowledge and improper expert testimony (see objection

14          No. 25).

15   36.    Defendants object to a portion of Paragraph 8 of the Greifinger Declaration, which is

16          identical to the objected-to portion of Paragraph 9 of the Blumenkrantz Declaration, on the

17          same grounds of lack of personal knowledge and improper expert testimony (see objection

18          No. 26)

19   37.    Defendants object to Paragraph 10 of the Greifinger Declaration on relevance grounds.  This

20          Paragraph is identical to Paragraph 11 of the Blumenkrantz Declaration (see objection No.

21          28).   Defendants also object to Paragraphs 9 and 10 of the Greifinger Declaration on the

22          ground that the declarant lacks personal knowledge and the testimony is speculative and

23          improper expert opinion.  Paragraph 9 states that: "Similarly, I think that CDCR could have

24          helped to avoid many of the problems resulting from the County's inability to provide timely

25          dialysis treatment for Mr. Calloway by taking such simple steps as ensuring that the County

26          had timely and adequate information about Mr. Calloway's serious medical needs by

27          telephoning the County Jail in advance of Mr. Calloway's transfer so that arrangements for

28          dialysis could have been made."  The objection is OVERRULED with respect to Paragraph

9:  Dr. Greifinger is an expert in correctional institution health care systems, and is qualified to give an opinion with regard to how Plaintiff's medical needs should have been handled. With respect to Paragraph 10, the objection is OVERRULED for the same reasons recited in objection No. 28.

38.  Defendants object to a portion of Paragraph 11 of the Greifinger Declaration, in which he states "County Jail leadership failed to train custody officers not to punish inmates seeking medical care."  Defendants object on the ground of lack of personal knowledge and improper expert testimony.  The Court agrees with both objections: there is no evidence that Dr. Greifinger, a medical expert, is familiar with training procedures.  Thus, the objections are SUSTAINED.

39.  Defendants object to a portion of Paragraph 11 of the Greifinger Declaration, in which he states "Further, I believe that the Jail custody staff should have contacted a nurse when Mr. Calloway was asking for medical care, not shoot him with a Taser.  I believe that shooting Mr. Calloway with the Taser weapon unnecessarily subjected Mr. Calloway to the risk of serious harm in view of his medical condition."  Defendants object on the ground of lack of personal knowledge and improper expert testimony.  The objection is OVERRULED to the extent it seeks to exclude Dr. Greifinger's medical opinion concerning the risk of serious harm of "tasing," given Plaintiff's medical condition.

40.  Defendants object to Paragraph 12 of the Greifinger Declaration, in which he states that "In my view, the failures described above caused trauma to Mr. Calloway's access graft, delayed Mr. Calloway's dialysis treatment, and subjected Mr. Calloway to repeated infections, all of which produced consequent physical and emotional harm to Mr. Calloway."  According to Defendants, the declarant lacks personal knowledge and the testimony is improper expert opinion.  The Court disagrees – Dr. Greifinger is qualified to render an opinion about whether Defendants' actions caused harm to Plaintiff.  Thus, the objections are OVERRULED.

41.  Defendants object to a portion of Paragraph 13 of the Greifinger Declaration, in which he states "County Jail leadership, medical staff, and custody staff purposefully failed to act to

38

1
2
3
4
5
6
respond to Mr. Calloway's medical need."  Defendants object on the ground of lack of personal knowledge and improper expert testimony.  To the extent that Dr. Greifinger opines on Defendants' intent ("purposefully") he is rendering an opinion on an ultimate legal issue in the case and invading the province of the jury.  Moreover, he is without personal knowledge and rendering an opinion which is outside the scope of his expertise.  Accordingly, the objections are SUSTAINED.

7
8
9
42.   Defendants object to a portion of Paragraph 13 of the Greifinger Declaration, which is identical to the objected-to portion of Paragraph 13 of the Blumenkrantz Declaration, on the same grounds of improper expert testimony (see objection No. 30).

10
11
12
13
14
15
43.   Defendants object to a portion of Paragraph 4, Paragraphs 7, 8, 10, 12 and 13 of the Griefinger Declaration on the ground that they are irrelevant or unduly prejudicial.  Defendants argue that references to events in 2002 are irrelevant as to CDCR, because Plaintiff's claims against CDCR are based on events that occurred in 2001.  The Court disagrees – Plaintiff's ADA and RA claims are based on events in 2002.  Thus, these objections are OVERRULED.

16
**C.     Summary Judgment/Judgment on the Pleadings**

17
**1.     Exhaustion of Administrative Remedies**

18
19
20
21
22
23
24
25
26
As an initial matter, Defendants claim that Plaintiff failed to exhaust administrative remedies, and thus his claims are barred by the Prison Litigation Reform Act (PLRA).[8]  Under 42 U.S.C. § 1997e(a), no action may be brought pursuant to 42 U.S.C. § 1983 or any other Federal law with respect to prison conditions unless the prisoner has exhausted administrative remedies.  "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit."  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  Further, the exhaustion requirement applies to "all suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Id.* at 532.

27
28
_____

[8]This argument is raised by all Defendants except for the "medical Defendants" – Longstreth, Rael, and Brooks.

The State of California provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers.  *See id.* § 3084.1(e).  In order to exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal resolution, (2) formal written appeal on a CDC 602 inmate appeal form, (3) second level appeal to the institution head or designee, and (4) third level appeal to the Director of the California Department of Corrections.  *Id.* § 3084.5; *Barry v. Ratelle*, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  This satisfies the administrative remedies exhaustion requirement under § 1997e(a).  *Id.* at 1237-38.

Contra Costa County also has an administrative grievance procedure with at least one level of appeal available for inmates in the custody of the Sheriff's Office.  Rubin Decl. at ¶ 2.  Inmates could make grievances orally or in writing, but they were customarily asked to fill out a standard grievance form.  Copies of the grievance policy were posted near the deputy's station in each housing unit.  *Id.* at ¶¶ 3-4.  Under the policy, an appeal would be considered concluded when it was reviewed by the Sheriff.  *Id.* at ¶ 5.

Nonexhaustion under § 1997e(a) is an affirmative defense – defendants have the burden of raising and proving the absence of exhaustion.  *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir.), *cert. denied*, 540 U.S. 810 (2003).  As there can be no absence of exhaustion unless some relief remains available, a movant claiming lack of exhaustion must demonstrate that pertinent relief remained available, whether at unexhausted levels or through awaiting the results of the relief already granted as a result of that process.  *Brown v. Valoff*, 422 F.3d 926, 936-37 (9th Cir. 2005).

In deciding a motion to dismiss for failure to exhaust nonjudicial remedies the court may look beyond the pleadings and decide disputed issues of fact.  *Wyatt*, 315 F.3d at 1119-20.  If the court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal without prejudice.  *Id.* at 1120.

According to Defendants, Plaintiff never filed an administrative grievance regarding the

United States District Court
For the Northern District of California

March 15 incident.[9]  Instead, he requested copies of incident reports related to the tasing, and those requests were denied.  *See* Rubin Decl. Ex. E.  This does not satisfy the exhaustion requirement.  *See Beaman v. Reagan*, 2001 WL 1681164 (N.D. Cal. 2001) (Alsup, J.) (holding that requesting copies of incident report does not constitute exhaustion of administrative remedies).  Plaintiff testified at his deposition that he requested the incident report because he wanted to file a grievance, but at the time he did not know who was involved in the incident.[10]  "Because they shot me, hog tied me, threw me in the van and dropped me off at San Quentin.  So I didn't know.  The only one I knew was Chalk, so he is the only one I knew."  Knapp Decl. Ex. A (Calloway Depo. 7/7/06 at 143).

In other words, Plaintiff does not contend that he did exhaust administrative remedies – rather, he argues that he should be excused from the exhaustion requirement.  According to Plaintiff, dismissal for failure to exhaust administrative remedies is inappropriate where such remedies are not "available" to the inmate.  Here, the County's grievance policy required the inmate to submit grievances within 48 hours of the incident at issue.  McDonald Decl. Ex. 25 (Rubin Depo. at 1).  Because Plaintiff was returned to San Quentin on the day of the tasing incident, and remained there for several weeks, he "did not have access to the County Jail grievance process within the forty-eight hour deadline.  Plaintiff's transfer to San Quentin, therefore, rendered the County Jail grievance process "unavailable" to him."  Opposition to Motion for Summary Judgment by Contra Costa

---

[9]The custodian of records for Custody Services Bureau of the Contra Costa County Sheriff's Office declares that copies of all inmate grievances and appeals are kept in the inmate's booking files.  Rubin Decl. at ¶ 7.  She states that "I have diligently searched for and reviewed all available inmate booking files and records relating to plaintiff Jamisi Calloway, a.k.a. Earl Turner.  There is no record in the material I discovered and reviewed of any grievance, complaint or appeal presented by Mr. Calloway relating to a tasing incident on March 15, 2001, other than the request attached as Exhibit E [Plaintiff's request for an incident report].  There is no record of any grievance, complaint, or appeal presented by Mr. Calloway in which he complained of a delay in arranging dialysis treatment for him in March 2001, or the period February to April, 2002, inclusive, while he was in the custody of the Sheriff's Office during those times."  *Id.*

Likewise, the Chief of the Inmate Appeals Branch for CDCR declares that there was only one grievance submitted by Plaintiff in 2001.  Grannis Decl. at ¶¶ 1, 7-8; *id.* at Ex. A.  This grievance was related to Plaintiff's "Work Group/Privilege Group" status, and made no mention of the tasing incident.  Grannis Decl. at Ex. B.

Plaintiff apparently did file and exhaust a grievance with CDCR on February 21, 2002, which was categorized as "medical."  Grannis Decl. at Ex. A.  However, neither party provides any information about this grievance.

[10]Plaintiff testified that he knew the difference between a grievance and a request.  Knapp Dec. Ex. A (Calloway Depo. 7/14/06 at 198).

1    County and Contra Costa County Sheriff's Department at 21.  Likewise, with respect to his claim of

2    constitutionally inadequate medical care, Plaintiff argues that Defendants' conduct "caused Plaintiff

3    to become so ill repeatedly that he required hospitalization and was rendered incapacitated to file

4    and pursue an administrative appeal within the 15 working day time limit [applicable to grievances

5    in the state prison system]."  Opposition to Motion for Summary Judgment by CDCR at 17.

6         In support of his theory, Plaintiff relies on *Rodriguez v. Westchester County Jail*

7    *Correctional Department*, 372 F.3d 485, 488 (2nd Cir. 2004), which suggested that a prisoner's

8    transfer from the custody of the officials who inflicted the alleged harm rendered administrative

9    remedies no longer "available."  *See also Bradley v. Washington*, 441 F. Supp. 2d 97, 101-03

10   (D.D.C. 2006) (holding that an inmate's transfer from state to federal custody rendered grievance

11   procedures unavailable, so dismissal for failure to exhaust was inappropriate).  Plaintiff also cites

12   cases holding that where prison officials prevent a prisoner from utilizing an administrative remedy,

13   it is not "available" and need not be exhausted.  However, aside from the fact that he was not

14   provided with the incident report on the March 15 incident, Plaintiff offers no evidence that he was

15   prevented from filing a grievance – on the contrary, he admits that he was provided with grievance

16   forms.  *See* Opposition to Motion for Summary Judgment by Contra Costa County and Contra Costa

17   County Sheriff's Department at 22.  There is no question that Plaintiff could have filed a grievance

18   without the incident report.  Most likely it would have been denied due to the absence of relevant

19   information, such as the identities of the officers who participated, but Plaintiff would have fulfilled

20   the exhaustion requirement, which is a prerequisite to filing a federal action.

21        Defendants argue that Plaintiff's argument is similar to that made by the inmate in *Ngo v.*

22   *Woodford*, 126 S.Ct. 2378 (2006), which was rejected by the Supreme Court.  In *Ngo*, the inmate

23   argued that the PLRA should be interpreted to require "exhaustion simpliciter" – i.e., a prisoner may

24   not bring suit in federal court until administrative remedies are no longer available to him, regardless

25   of the reason for such unavailability.  The court held that the PLRA requires proper exhaustion – i.e.,

26   the prisoner must complete the administrative review process in accordance with applicable

27   procedural rules, including deadlines.  This case is distinguishable from *Ngo*, in that Plaintiff is

28   arguing that there was a particular reason why the administrative remedies were unavailable –

United States District Court
For the Northern District of California

42

**United States District Court**
For the Northern District of California

1    namely, that he was transferred to another institution and/or hospitalized, which prevented him from

2    complying with the administrative deadlines.  However, the Court pointed out in *Ngo* that most

3    administrative grievance procedures, including California's, do not necessarily require rigid

4    adherence to deadlines.  126 S.Ct. at 2389 ("Under the California system . . . a prisoner has

5    numerous opportunities to miss deadlines.").  Plaintiff did not attempt to file a late grievance about

6    the March 15 incident or his allegedly inadequate medical care.  Indeed, with respect to the claims of

7    deliberate indifference to medical needs and ADA/RA violations, the fact that Plaintiff apparently

8    made no effort whatsoever to file any formal or informal grievance at any time – even after returning

9    from being hospitalized – weighs in favor of finding that Plaintiff failed to exhaust.  Further, *Ngo* is

10   instructive, in that it indicates the Supreme Court's position that the exhaustion requirement should

11   be strictly construed.  This counsels against adoption of Plaintiff's unavailability argument.

12        Further, Defendants argue that the cases cited by Plaintiff are distinguishable because they

13   dealt with inmates who were transferred out of a prison system, never to return.  This does appear to

14   be true in *Bradley*, but *Rodriguez* deals with a situation similar to the one at hand: the plaintiff

15   claimed to have been mistreated while in the custody of the county jail, but he was transferred to

16   what appears to be a state prison.  On the other hand, the decision in *Rodriguez* does not make clear

17   whether the prisoner, like Plaintiff, was transferred back and forth between State and County

18   custody repeatedly and on a regular basis over a period of years.  Thus, this case is arguably

19   distinguishable from *Rodriguez*, in the sense that Plaintiff could have filed a late grievance when he

20   returned to the County jail.

21        Based on the foregoing, the Court agrees with Defendants that Plaintiff failed to exhaust his

22   administrative remedies with respect to the claims of excessive force, deliberate indifference to

23   medical needs, racial discrimination, and violation of the ADA and RA.  Accordingly, these claims

24   are DISMISSED.

25

26        In the alternative, the Court grants summary judgment as to several of Plaintiff's claims, as

27   discussed below.

28   **2.      Deliberate Indifference to Serious Medical Needs claim against Defendants Rael,**

43

**Longstreth, Gray, Chalk, County, Lumb, and Brooks**

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104).  A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.*  If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson*, 290 F.3d at 1188.

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however.  Neither a finding that a defendant's actions are egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights, *McGuckin*, 974 F.2d at 1060, 1061 (citing *Hudson v. McMillian*, 503 U.S. 1, 7-10 (1992) (rejecting "significant injury" requirement and noting that Constitution is violated "whether or not significant injury is evident")), but the existence of serious harm tends to support an inmate's deliberate indifference claims, *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin*, 974 at 1060).

United States District Court
For the Northern District of California

1   "A difference of opinion between a prisoner-patient and prison medical authorities regarding

2   treatment does not give rise to a § 1983 claim."  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir.

3   1981).  Similarly, a showing of nothing more than a difference of medical opinion as to the need to

4   pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate

5   indifference, *see Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.

6   1989).

7   Although prison authorities have "wide discretion" in the medical treatment afforded

8   prisoners, *see Stiltner v. Rhay*, 371 F.2d 420,421 (9th Cir. 1967), failure to provide treatment for

9   administrative reasons is sufficient to generate a genuine issue of material fact as to deliberate

10  indifference on the part of the doctor failing to treat the patient.  *Jett*, 439 F.3d 1097.  In deciding

11  whether there has been deliberate indifference to an inmate's serious medical needs, the court need

12  not defer to the judgment of prison doctors or administrators.  *Hunt*, 865 F.2d at 200.

13  A claim of medical malpractice or negligence is insufficient to make out a violation of the

14  Eighth Amendment.  *See Toguchi v. Chung*, 391 F.3d 1051, 1060-61 (9th Cir. 2004); *Hallett v.*

15  *Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *McGuckin*, 974 F.2d at 1059 (mere negligence in

16  diagnosing or treating a medical condition, without more, does not violate a prisoner's 8th

17  Amendment rights).

18  In this case, it is clear that Plaintiff had an objectively serious medical need.  It is undisputed

19  that he has end-stage renal disease and requires regular dialysis.

20  However, the medical Defendants (Rael, Longstreth, and Brooks) argue that they were not

21  deliberately indifferent to this need.  Rather, they argue that Plaintiff has stated, at best, a claim for

22  negligence: "in each instance in which he complains that medical staff was deliberately indifferent to

23  his needs for dialysis, the records show that appropriate orders were given by medical staff and that

24  efforts were made to find a dialysis appointment for Mr. Calloway and to transport him to it."

25  Motion for Summary Judgment by Defendants Longstreth, Rael, and Brooks at 14.  In response,

26  Plaintiff argues that there are issues of material fact precluding summary judgment such as: whether

27  the medical Defendants were aware that he had missed dialysis on March 14, 2001; whether the

28  County medical staff were aware of the court order requiring Plaintiff to be dialyzed in the County;

45

1  whether the medical staff were aware that Plaintiff had missed dialysis on February 21, 2002; and

2  whether sending Plaintiff to the County Hospital's emergency room despite the fact that it did not

3  have dialysis facilities constituted deliberate indifference.  Further, Plaintiff contends that the

4  opinions of his medical experts regarding the adequacy of his care create a genuine issue of fact

5  regarding whether the medical Defendants were deliberately indifferent to Plaintiff's needs, causing

6  him substantial injury.  See Opposition to Motion for Summary Judgment by Longstreth, Rael, and

7  Brooks at 12-16.

8      In this Court's view, even taking the facts in the light most favorable to Plaintiff, there is

9  simply no indication that the medical Defendants purposefully failed to act to meet Plaintiff's

10  medical needs.  Even the expert opinions offered by Plaintiff do not support a finding of <u>deliberate</u>

11  indifference – instead, for example, Dr. Greifinger states that there were failures to maintain

12  continuity of care for Plaintiff, that delays in access to dialysis "should not occur in a correctional

13  environment," and that correctional health care providers "failed to ensure that Mr. Calloway had

14  adequate and timely dialysis as well as appropriate measures to avoid infection."  Greifinger Decl. at

15  ¶ 4.  Assuming all of this is true, so long as the medical Defendants were making efforts to find a

16  dialysis provider for Plaintiff, and to find emergency treatment when it was necessary, the Court

17  should not find that they were deliberately indifferent.  Plaintiff has not introduced evidence

18  contradicting the medical Defendants' contention that at all times, they attempted to locate and

19  provide appropriate treatment for Defendant.  Instead, he has produced a good deal of evidence that

20  they failed in that endeavor.  But under the standards articulated above, that is simply insufficient to

21  make out a violation of the Eighth Amendment.

22      The other Defendants against whom this cause of action is asserted – Gray, Chalk, County,

23  and Lumb – argue that their actions were motivated not by indifference to Plaintiff's medical needs

24  but, on the contrary, by the intent to obtain necessary medical treatment for Plaintiff.  In essence,

25  they argue that tasing Plaintiff was necessary to get him to dialysis, that a nurse was immediately

26  called after the tasing, and that Plaintiff was then transported to San Quentin for dialysis.  Plaintiff,

27  in response, blends his excessive force claim into his deliberate indifference claim, arguing that the

28  use of force against an inmate in Plaintiff's condition constituted deliberate indifference to his

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  medical needs.  *See* Opposition to Gray Motion for Summary Judgment at 14; Opposition to Chalk

2  Motion for Summary Judgment at 15-16.  Further, Plaintiff makes the conclusory allegation that

3  these Defendants "ignored both the Court Order and Plaintiff's pleas for treatment and made no

4  attempt to summon medical providers to respond to Plaintiff's serious medical need."  Opposition to

5  Chalk Motion at 16.  However, there is no dispute that Defendants "ignored" the court order because

6  no dialysis was available in the County Hospital, and that they made every effort to respond to

7  Plaintiff's need for dialysis by transporting him to San Quentin.  The only thing that the officers

8  were deliberately indifferent to was Plaintiff's desire to obtain dialysis in the County – but Plaintiff

9  cites no authority for the proposition that a prisoner has an Eighth Amendment right to receive

10 treatment in the location or with the provider of his choice.  Thus, there are no genuine issues of

11 material fact with respect to whether the Contra Costa County Sheriff's deputies were deliberately

12 indifferent to Plaintiff's medical needs.

13      Further, the Court believes that Defendants are entitled to qualified immunity – reasonable

14 medical personnel and officers in Defendants' position would not know that their actions were

15 unlawful.  Accordingly, in the alternative to dismissal for failure to exhaust administrative remedies,

16 the Court GRANTS Defendants' Motion for Summary Judgment on this claim.

17 **3.      Municipal Liability, Failure to Train, and Negligent Supervision claims against
         Defendants Contra Costa County Sheriff's Department and Contra Costa County**

18      Plaintiff alleges that Defendants failed to adequately train the individual Defendants in the

19 proper use of force.  Compl. at ¶¶ 120-121.  Further, Plaintiff alleges that the use of excessive force

20 was so widespread as to constitute "a custom or policy with the force of law."  *Id.* at ¶¶ 124, 128.

21 Finally, Plaintiff alleges that the entity Defendants failed to adequately supervise the use of force by

22 the individual Defendants.  *Id.* at ¶ 136.

23      Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official

24 policy or custom causes a constitutional tort, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690

25 (1978).  However, a city or county may not be held vicariously liable for the unconstitutional acts of

26 its employees under the theory of respondeat superior, *see Board of County Comm'rs v. Brown*, 520

27 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th

28

47

United States District Court
For the Northern District of California

1   Cir. 1995).  To impose municipal liability under § 1983 for a violation of constitutional rights, a

2   plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was

3   deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

4   indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind

5   the constitutional violation.  *See Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d 432, 438

6   (9th Cir. 1997).

7       A local government may also be liable for constitutional violations resulting from its failure

8   to supervise, monitor or train, but only where the inadequacy of said supervision, monitoring or

9   training amounts to deliberate indifference to the rights of the people with whom the local

10  government comes into contact.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Long v.*

11  *County of Los Angeles*, 442 F.3d 1178, 1188-89 (9th Cir. 2006); *Van Ort v. Estate of Stanewich*, 92

12  F.3d 831, 835 (9th Cir. 1996); *Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir. 1995).  Only

13  where a failure to supervise and train reflects a "'deliberate' or 'conscious' choice" by a local

14  government can the local government be liable under § 1983.  *See Harris*, 489 U.S. at 389.  Further,

15  the plaintiff must demonstrate that the alleged deficiency in supervision and training actually caused

16  the requisite indifference.  *See id.* at 391.  The appropriate inquiry is therefore whether the injury

17  would have been avoided "had the employee been trained under a program that was not deficient in

18  the identified respect." *Id.*

19      The Contra Costa County Sheriff's Department had a written policy regarding the use of

20  force in effect at the time of the incident.  It states, in part, that "Detention Division personnel will

21  use only that force and restraint necessary to control an inmate who displays a violent or threatening

22  behavior.  Physical force shall be used as a last resort . . . Force and restraints shall not be used as a

23  form of punishment."  Rubin Decl. Ex. F.  Specifically, the policy states that the taser gun "may be

24  used to restrain, control and/or subdue a violent or potentially violent individual . . .  Prior to use of

25  the taser, consideration should be given to determine if: A.  Attempts to subdue or control the

26  individual through use of conventional tactics have been or are and will likely be ineffective in the

27  situation. B.  There is reasonable expectation that it will be unsafe and dangerous for officers or

28  personnel to approach within physical contact distance of the individual." *Id.*

48

United States District Court
For the Northern District of California

1  Based on the standards for evaluating claims of constitutionally excessive force discussed

2  above, this policy is facially constitutional – it does not allow use of force as punishment or for the

3  purpose of inflicting pain, and it requires the amount of force to be proportional to the danger posed

4  by the inmate.  Plaintiff argues that the policy was unconstitutionally broad, because it authorized

5  use of the taser to subdue a <u>potentially</u> violent individual.  *See* Opposition to Motion for Summary

6  Judgment by Contra Costa County and Contra Costa County Sheriff's Department at 13.  Further, the

7  policy does not require the officer to consider the medical condition of the inmate before using the

8  taser.  *Id*. at 14.  Plaintiff urges the Court to leave the question of whether the policy was

9  constitutionally inadequate for a jury, citing *Gibson*, 290 F.3d at 1191 (holding that so long as a jury

10  could infer that the policymakers knew that the policy would pose a substantial risk of serious harm

11  to someone in the plaintiff's position, summary judgment is not appropriate).  However, Defendants

12  correctly point out that Plaintiff has not offered admissible evidence that using a taser on an inmate

13  with Plaintiff's health problems causes injury.  Further, Plaintiff cites no authority for the proposition

14  that the use of force on a potentially violent individual, or the use of force to prevent a violent

15  situation, violates the Eighth Amendment.  In the Court's view, there are no triable issues with

16  regard to whether Contra Costa County's policy on the use of force gives rise to municipal liability

17  under § 1983.

18  Finally, Plaintiff has not provided evidence of a pattern or custom of use of excessive force

19  by employees, nor has he offered evidence regarding inadequate training of officers in the use of

20  force.  He contends that the inadequacy of training is demonstrated by the March 15 incident itself,

21  but that is insufficient to support a claim of municipal or supervisory liability.  Simply put, there is

22  no evidence that the County caused or allowed a constitutional violation to occur.  Thus, in the

23  alternative to dismissal for failure to exhaust administrative remedies, the Court GRANTS summary

24  judgment on the claim of municipal liability for the use of excessive force.

25  **4.      Battery claim against Defendants Gray, Chalk, County, and Lumb**

26  Plaintiff does not oppose summary judgment as to the battery claim.  *See* Oppositions to

27  Motions for Summary Judgment by Gray, Chalk, County, and Lumb at 2 n.2.  Accordingly, the

28  Court GRANTS summary judgment as to this claim.

49

**5.      Claim under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) against Defendants Contra Costa County Sheriff's Department, Contra Costa County, and California Department of Corrections and Rehabilitation**

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The RA similarly prohibits discrimination based on disability, and the same factors apply for analyzing an RA claim and an ADA claim.  *See Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996); *Olmstead v. Zimring*, 527 U.S. 581 (1999).  To state a claim, the plaintiff must allege that (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of the public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

Both the ADA and the RA apply in the state prison context, and prevent disabled prisoners from being excluded from participation in prison programs or discriminated against in the various aspects of prison life.  *Armstrong v. Wilson*, 124 F.3d 1019, 1022-24 (9th Cir. 1997).  However, Defendants cite cases holding that the ADA and RA are not violated by a prison's failure to adequately address the medical needs of disabled inmates.  *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (so holding, and noting that "the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners.  We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act").[11]  *See also Rosado v. Alameida*, 2005 WL 892120 (S.D. Cal. 2005) (citing *Bryant* with approval, and holding that the plaintiff failed to state an actionable ADA claim because his complaint was about the quality and

_____

[11]*Bryant* was cited approvingly in an unpublished disposition of the Ninth Circuit, *Marlor v. Madison County Idaho*, 50 Fed. Appx. 872, 874 (9th Cir. 2002), in which the court held that "[i]nadequate medical care does not provide a basis for an ADA claim unless medical services are withheld *by reason of* a disability."

United States District Court
For the Northern District of California

1   extent of his access to medical care; "the benefits and services Plaintiff wishes to receive are <u>for</u> his

2   disability").  Thus, Defendants argue, Plaintiff has failed to state a claim for violation of the ADA

3   and RA, and those claims should be dismissed (or the Court should enter judgment on the pleadings

4   or summary judgment).

5          Plaintiff asserts that he "was excluded from participation and denied the benefits of

6   numerous CDCR services, programs and activities.  Certainly, the extensive history of CDCR's

7   failure to provide Plaintiff with timely dialysis treatment . . . is a critical service that was denied to

8   Plaintiff."  He also asserts that he was discriminated against with respect to other services, programs

9   and activities "such as the method of restraining Plaintiff, hygiene and wound care, laundry services,

10  visitation and the ability to participate in any other service, program or activity, as he was repeatedly

11  rendered seriously sick by CDCR's failure to accommodate Plaintiff's disability."  Opposition to

12  CDCR's Motion at 13.  Plaintiff repeats several times that Defendants failed to accommodate his

13  disability and he was denied benefits based on his disability.  However, he really does not identify

14  any service, program, or activity that he was excluded from aside from proper medical care.  The

15  method of restraining Plaintiff does not qualify as a service, program, or activity.  Plaintiff does not

16  allege that he was denied hygiene and laundry services – rather, he alleges that he should have

17  received more or better hygiene and laundry services because he was disabled.  In other words,

18  Plaintiff asserts that adequate medical care would have involved additional hygiene and laundry

19  services.  The gravamen of Plaintiff's ADA and RA claim is that as a result of Defendants' failure to

20  deliver adequate medical care to him, he was denied the opportunity to engage in regular prison life,

21  because he was sick.  However, based on the case law discussed above, the Court is not persuaded

22  that this is an actionable ADA/RA claim.  It is, essentially, a claim that like that in *Rosado, supra*:

23  the benefits and services that Plaintiff wished to receive are <u>for</u> his disability; he does not, in any

24  real sense, allege that he was denied benefits and services <u>because of</u> his disability.

25         Defendant CDCR also argues that Plaintiff's claims against it are barred by the statute of

26  limitations.  Plaintiff refutes this claim, and argues in the alternative that equitable tolling should

27  apply.  The Court need not reach these arguments.  Plaintiff failed to exhaust his administrative

28  remedies as to the ADA/RA claims, and the claims fail as a matter of law in any event for the

51

United States District Court
For the Northern District of California

1 reasons discussed.

2          Accordingly, in the alternative to dismissal for failure to exhaust administrative remedies, the

3 Court GRANTS Defendants' Motion for Judgment on the Pleadings or Summary Judgment on the

4 ADA/RA claims.

5                                          **CONCLUSION**

6          The Court GRANTS Defendants' Motion to Dismiss Plaintiff's claims of excessive force,

7 deliberate indifference to medical needs, racial discrimination, and violation of the ADA and RA for

8 failure to exhaust administrative remedies.  In the alternative, Defendants' Motion for Summary

9 Judgment is GRANTED as to the claim of deliberate indifference to medical needs, as to the claim

10 of municipal liability for excessive force, and as to the ADA/RA claim.

11          IT IS HEREBY ORDERED THAT Plaintiff's claims of excessive force (as to the individual

12 Defendants) and racial discrimination are DISMISSED WITHOUT PREJUDICE.  However,

13 because the Court has determined that there are no triable issues of fact with respect to the claims of

14 deliberate indifference to medical needs, municipal liability for excessive force, and violation of the

15 ADA/RA, those claims are DISMISSED WITH PREJUDICE, as exhaustion and re-filing of those

16 claims would be futile.

17          IT IS FURTHER ORDERED THAT Defendants' Motion for Summary Judgment is

18 GRANTED as to the battery claim.

19          The clerk shall close the file and terminate all pending matters, including the trial date.

20          IT IS SO ORDERED.

21

22

23 Dated: 1/16/07                      SAUNDRA BROWN ARMSTRONG
                                       United States District Judge
24

25

26

27

28

52